876 P.2d 548

**In the Matter of a Member of the State Bar of Arizona, John Adair SHANNON, Jr., Respondent.**

No. SB–92–0001–D.
Disc. Comm. Nos. 88–1932, 89–0710.

Supreme Court of Arizona,
In Division.

June 21, 1994.

Reconsideration Denied Oct. 19, 1994.

State Bar of Arizona by Margaret D. White, Sr. Bar Counsel, Phoenix, for State Bar of AZ.

Browder & Kenney, P.C. by Robert W. Browder, Phoenix, for respondent Shannon.

## OPINION

CORCORAN, Justice.

On February 5, 1990, the State Bar of Arizona filed a formal complaint with a Hearing Committee (Committee) charging Respondent John Adair Shannon, Jr. with two counts of unethical conduct in which Respondent allegedly violated numerous ethical rules enumerated in rule 42, Arizona Rules of the Supreme Court. By a 2–1 vote, the Committee recommended that Respondent be suspended from the practice of law for a period of one year. The 8–member Disciplinary Commission (Commission) unanimously adopted the Committee's recommendation and further recommended that Respondent make restitution in the amount of $2,258.60.[1]

This is an appeal and a cross-appeal from the Disciplinary Commission's order filed October 28, 1991. The State Bar urges the court to find additional violations and argues that disbarment, rather than the recommended one-year suspension, is the appropriate sanction for Respondent's violations. Respondent challenges the Commission's findings, the recommended sanctions, and the imposition of costs and expenses. Respondent basically argues that: (1) the evidence presented is not sufficient to sustain a finding that he violated any ethical rule; (2) a one-year suspension is both an inappropriate and disproportionate sanction; (3) some of the charges assessed against him are duplicative; and (4) this court lacks the power to assess certain types of expenditures. We have jurisdiction pursuant to rule 53(e), Arizona Rules of the Supreme Court.

### FACTUAL AND PROCEDURAL HISTORY

Count One, the more serious of the two counts, arose out of Respondent's joint repre-

---

1. This figure represents the amount that Respondent's clients paid to the attorney who took over their case.

sentation of co-defendants, Fairfield Sunrise Village (Fairfield) and Client A.[2] Count One alleged that: (1) Fairfield's interests were adverse to Client A's interests, and alternatively that Respondent's representation of Client A may have been materially limited by responsibilities to Fairfield, third parties, or Respondent's own interests; (2) Respondent materially altered certain of Client A's handwritten answers to interrogatories without consulting Client A and without providing Client A with a copy of the altered interrogatories; (3) Respondent submitted the altered interrogatories, along with the verification that Client A signed for their original handwritten answers to the court in support of a motion for summary judgment; and (4) Respondent failed to adequately communicate with Client A or to respond to reasonable requests for information during his representation of Client A. Based on these allegations, Respondent was charged with violating Ethical Rules (ER) 1.2(a) and (d), 1.4, 1.7, 3.1, 3.3(a)(1) and (4), 3.4(a) and (b), 4.1(a), and 8.4(c) and (d) of rule 42, Arizona Rules of the Supreme Court. After a hearing, the Committee concluded that Respondent violated ERs 1.4(a), 1.4(b), 1.7(a), and 3.3. Despite having adopted the Committee's factual findings, the Commission concluded that Respondent violated ERs 1.4(a), 1.4(b), 1.7(b), 3.3, 8.4(c), and 8.4(d).

Count Two arose out of Respondent's representation of Client B in a personal injury matter in which Respondent obtained a judgment. The complaint alleged that Respondent: (1) failed to follow specific instructions from opposing counsel by cashing the check that opposing counsel sent to him in satisfaction of a judgment without first executing a satisfaction of judgment; (2) ignored opposing counsel's subsequent requests to sign the satisfaction forcing opposing counsel to file a motion to compel; and (3) waited another full week after the court granted the motion to compel before signing the satisfaction of

judgment. Based on these allegations, Respondent was charged with violating ERs 1.15, 1.2(d), 3.2, and 8.4(d). After a hearing before the Committee and a review by the Commission, the Commission concluded that Respondent violated ER 1.15 and 3.2.

## A. Respondent's Violations

Respondent challenges both the Commission's findings and its recommended sanctions. He argues that there was insufficient evidence to support a finding that he violated any ethical rule. Respondent further argues that, even assuming he violated an ethical rule, the recommended sanctions are inappropriate because the Committee and Commission inappropriately considered his failure to "directly acknowledge the wrongful nature of his conduct" as an aggravating factor. Moreover, Respondent argues that the recommended sanction does not take into account his voluntary cessation of the practice of law and is disproportionate to the sanctions imposed in similar cases.

## 1. Standard of Review

In disciplinary matters, this court acts as an independent arbiter of both the facts and the law. *In re Neville,* 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). In acting as an arbiter of the facts, we give deference and serious consideration to the findings of both the Committee and Commission. *In re Pappas,* 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988), citing *Neville,* 147 Ariz. at 108, 708 P.2d at 1299. Before we impose discipline, however, *we* must be persuaded by clear and convincing evidence that Respondent committed the alleged violations. *E.g., In re Kersting,* 151 Ariz. 171, 172, 726 P.2d 587, 588 (1986); *see also* rule 54(c), Arizona Rules of the Supreme Court. Similarly, in acting as an arbiter of the law, we give great weight to the recommendations of the Committee and the Commission. *In re Lincoln,* 165 Ariz. 233, 235–36, 798 P.2d 371,

---

**2.** We recognize that clients who seek counsel from lawyers often do so in confidence. We believe that such confidences should not be breached merely because the lawyer involved is the subject of a disciplinary procedure. We therefore use Client A and Client B instead of the clients' actual names.

Mr. and Mrs. A were co-defendants with Fairfield in the underlying litigation. For purposes of readability we will describe Mr. and Mrs. A either together or singularly as "Client A." When using pronouns, we will use they, their, his, or her as applicable.

373–74 (1990), citing *Neville*, 147 Ariz. at 115, 708 P.2d at 1306. Yet, *this court* is ultimately responsible for determining the appropriate sanction. *Lincoln*, 165 Ariz. at 236, 798 P.2d at 374.

## 2. Count One

The Committee heard testimony concerning Count One and made its Findings of Fact in its report filed June 4, 1991. The Commission, after hearing arguments on this count, adopted the Committee's Findings of Fact. After reviewing the record, this court likewise adopts the Committee's Findings of Fact, which are summarized below.

In December 1986, attorney Gerald W. Nabours sued Fairfield and Client A on behalf of multiple plaintiffs who had purchased condominiums from Fairfield. The complaint alleged that Fairfield breached its contract with plaintiffs and had committed fraud. On these two counts, the complaint sought rescission, compensatory damages, and punitive damages. The complaint also alleged that both Fairfield and Client A (defendants) violated Arizona's RICO statutes. For this count, the complaint sought treble damages, costs, and attorneys' fees.

The essence of the complaint was that defendants used a priority-rent-back program to induce plaintiffs to purchase the condominiums and then arbitrarily discontinued the program. Plaintiffs claimed that defendants represented that plaintiffs' condominiums would be included in a priority-rent-back program. Under this program, Fairfield would rent plaintiffs' condominiums to house prospective purchasers of Fairfield property, guests or visitors. According to the complaint, defendants represented that the units were to be rented with a priority based upon the date of their purchase, and that the priority-rent-back program was to continue as long as the rental program was in effect. Plaintiffs alleged that Fairfield arbitrarily discontinued the program without notice to or consent of plaintiffs.

Under a 1975 Consent Decree with the United States Securities and Exchange Commission (SEC), Fairfield was prohibited from marketing condominiums in conjunction with any priority-rent-back program, and its employees or sales representatives could neither discuss any such priority-rent-back program with prospective purchasers nor directly operate any such program. Fairfield believed, however, that it would not violate the Consent Decree if a separate entity such as Client A made representations about the priority-rent-back program. This belief led to the contract between Fairfield and Client A in which Client A contracted to provide rental management services to parties who purchased condominiums from Fairfield. Client A's contract with Fairfield was effective from November 1, 1982 to October 31, 1983. Because of the Consent Decree against Fairfield, it was important to Fairfield that Client A's operations be viewed as a separate entity with Client A acting on their own without Fairfield's knowledge or consent.

Fairfield's position on this matter was consistent from the very beginning. Nabours testified that he had been in contact with representatives of Fairfield before filing the complaint. He testified that Fairfield seemed to be taking the position that it had made no representations to prospective purchasers concerning a priority-rent-back program, and that any representations were made by others, specifically Client A or their representatives.

In January 1987, Fairfield retained Respondent's brother to defend it in the lawsuit. Shortly thereafter, Respondent assumed primary responsibility for the litigation. Respondent filed Fairfield's answer. Fairfield's answer was consistent with Nabours's initial impression that Fairfield was denying any knowledge of the priority-rent-back program. Fairfield denied allegations that it had a contract with Client A to handle the program, that Client A's office was in the Fairfield sales office building, that Client A was in continuous contact with the Fairfield sales agent, and that Fairfield sales agents and/or Client A made representations about the priority-rent-back program to induce plaintiffs to purchase their condominiums.

Nabours tried to discuss the priority-rent-back program with Client A before filing plaintiffs' lawsuit. Client A refused to discuss the matter with Nabours and contacted

Fairfield. Fairfield told Client A that Fairfield would defend them if Nabours filed suit. After being served, Client A again contacted Fairfield and was reassured that Fairfield would defend the action. As the time to file an answer approached, however, Client A retained Tucson attorney Marc Montijo.

Montijo contacted Respondent, following up on Client A's expectation that Fairfield would provide a defense. In a January 13, 1987 letter, Respondent answered Montijo's inquiry indicating that Fairfield's "objective appears to be one to indemnify and protect [Client A]" and promising to get back to Montijo with a final answer as soon as he could. Because the answer was due and Client A had not yet received final notification from Fairfield, Montijo filed an answer on behalf of Client A. The answer appears to have been filed on January 16, 1987. Because both Client A and Montijo anticipated that Fairfield would be defending this suit, Montijo and Client A spent little time formulating the answer. Accordingly, Client A's response was substantially a "general denial."

Respondent waited more than 5 months before advising Montijo that Fairfield would defend Client A as long as Client A's and Fairfield's interests were aligned. Even then, Respondent responded only after having received the following inquiries from Montijo: (1) letter dated March 2, 1987; (2) follow-up letter dated March 20, which contained a copy of Client A's answer; (3) letter dated May 11; and (4) letter dated May 20, which contained a Stipulation and Order of Substitution of Counsel from Montijo to Respondent and copies of interrogatories for Client A to complete. Respondent finally executed the Stipulation and Order of Substitution of Counsel on June 26, and the trial judge signed it on July 1.

Respondent did not discuss Client A's understanding of the facts underlying the case with either Montijo or Client A before agreeing to represent Client A. Respondent, however, had a copy of Client A's answer for approximately three months before undertaking Client A's representation. Some of Client A's responses to the allegations in the complaint were directly contrary to Fairfield's position. Fairfield denied allegations that it had a contract with Client A to handle the priority-rent-back program, that Client A's office was in the Fairfield sales office building, and that Client A was in continuous contact with the Fairfield sales agent. Client A, however, admitted each of these allegations. Moreover, when he agreed to represent Client A, Respondent did not know whether Fairfield would indemnify Client A in the event of a joint or sole judgment against Client A. Despite all of this, Respondent did not raise the possibility that a conflict of interest might exist, much less discuss the implications of joint representation.

On July 8, 1987, after Respondent agreed to represent Client A, Fairfield informed Respondent that it would not "undertake any duty to pay a judgment against [Client A] in the event of a judgment against [Client A] and not Fairfield." Respondent did not inform Client A of this development until a meeting on September 10—more than 2 months after first learning of Fairfield's intentions.

In a letter confirming his representation, Respondent sent a set of plaintiffs' interrogatories to Client A to complete. Respondent told Client A to pencil in the answers and advised them that he would put their answers in final form. Respondent also requested that Client A return a signed, notarized verification page with the completed interrogatories.

Client A's position was, and always has been, that they offered prospective condominium purchasers the priority-rent-back program based upon the purchase date at the direction of Fairfield's general manager, Bob Childs. According to Client A, they did not know that Fairfield was not following the priority-rent-back program until after their contract with Fairfield had been terminated. Client A testified that they assumed the program was working because Fairfield was renting units and Client A was issuing checks to individual condominium owners. Client A's written draft answers to the interrogatories were consistent with this position. Client A mailed the answers to the interrogatories and a completed verification form to Respondent on July 20, 1987.

Client A's answers to the interrogatories were inconsistent with Fairfield's answers to the same questions. Respondent admitted that if Client A's answers were true, a conflict existed between the positions of Fairfield and Client A. Accordingly, Respondent held a meeting on September 10 to discuss Client A's draft answers. Attending the meeting were Respondent, Client A, Norm Johnson (Fairfield's manager at that time), and Lon Franklin (another Fairfield employee). During this meeting, Respondent and Client A disagreed as to the length of time the priority-rent-back program was to run. After reviewing Client A's contract with Fairfield, Respondent told Client A that the contract's one-year term limited the priority-rent-back program to a one-year duration. Client A disagreed and told Respondent that the priority-rent-back program was supposed to be continuous until Fairfield discontinued the promotional program.

During this meeting, Respondent made his only reference to a potential conflict of interest. Respondent informed Client A that there was a possibility that a conflict would arise and that if a conflict arose, he would have to withdraw from representing Client A and Client A would have to seek other counsel. Respondent did not explain the concept of conflict of interest, what specific type of conflict might arise, or any of the advantages or risks that existed because of the joint representation. Moreover, Respondent did not advise Client A that he might have a cross-claim for indemnity against Fairfield, nor did Respondent inform Client A that Respondent might be constrained from raising certain defenses on Client A's behalf because of the joint representation.

During the September 10 meeting, Respondent, Client A, and Fairfield's representatives went through Client A's answers to the interrogatories. Ostensibly to save Client A from violating the Consent Decree between Fairfield and the SEC and thus avoid automatic liability for violating RICO, Respondent urged Client A to look at the situation differently and consider changing their answers. Despite the pressure to change their answers, Client A stood by their answers and assumed that Respondent would

submit the handwritten answers in typewritten form. This was, however, not the case.

On September 11, Respondent submitted to Nabours typewritten interrogatory answers along with the verification page that Client A signed on July 20. Respondent had changed Client A's answers to various interrogatories so that Client A's answers were consistent with Fairfield's position. Respondent testified that he and Fairfield's in-house counsel, Terry Flora, crafted the answers that Respondent submitted on behalf of Client A. According to Respondent, he discussed Client A's answers to the interrogatories with Flora both before and after the meeting on September 10, 1987.

Despite making substantial changes to Client A's answers to various interrogatories, Respondent did not discuss the changes with Client A, nor did he send Client A a copy of the interrogatories that he submitted on their behalf. In fact, Client A was not aware that Respondent had changed the answers on their interrogatories until September 29, 1988—over a year after Respondent had submitted them.

On June 28, 1988, Respondent notified Client A that trial was set for November 15. Client A became concerned about their position in the lawsuit because they had not had any contact with Respondent since their September 10, 1987 meeting. Accordingly, Client A sought the advice of Tucson attorney Jane Eikleberry. After hearing Client A's version of the case, Eikleberry determined that Respondent's representation of both Fairfield and Client A presented a conflict of interest, and she attempted to contact Respondent to discuss the problem.

Eikleberry eventually spoke with Respondent by telephone on August 4, 1988, but only after having left Respondent phone messages and after sending him a letter dated July 27 in which she expressed her concerns. Respondent denied any conflict of interest, although he admitted that Client A's and Fairfield's versions of the facts were somewhat dissimilar. Because of continuing concerns regarding the potential conflict of interest, Eikleberry called Nabours to discuss her concerns. Both agreed that a conflict existed. The next day, after discussing the

situation with Eikleberry, Client A decided to discharge Respondent. Eikleberry called and informed Respondent of his termination.

On September 29, 1988, Client A, Eikleberry, and Nabours met to discuss Client A's version of the facts. During this meeting, Client A discovered that Respondent had changed the answers to their interrogatories. Nabours believed Client A's version of the facts and executed a written settlement agreement with Client A dismissing them from the suit.

On October 27, after Client A terminated Respondent's representation and before the scheduled trial date, Respondent filed a reply in support of a motion for partial summary judgment on behalf of Fairfield and Client A, for whom he was still attorney of record. Despite having had a conversation with Eikleberry on October 10, in which she confronted Respondent about the doctored interrogatory answers, Respondent relied on the answers in support of the reply. Respondent's motion was denied. After Nabours dismissed Client A from the suit, Fairfield adopted a position that attributed all the responsibility for the priority-rent-back program to Client A.

Based on these facts, the Commission concluded that Respondent violated ERs 1.4(a) and (b) (Communication), 1.7(b) (Conflict of Interest), 3.3 (Candor Toward Tribunal), and 8.4(c) and (d) (Misconduct). Despite Respondent's arguments to the contrary, we find that clear and convincing evidence supports the Commission's findings. We further find, by clear and convincing evidence, that Respondent violated ERs 8.4(c) and (d).

a. Ethical Rule 1.7(b)—Conflict of Interest

█ The Committee concluded that Fairfield's and Client A's interests were adverse, and thus Respondent violated ER 1.7(a). Based on the same set of facts, however, the Commission found that Respondent violated ER 1.7(b). As Respondent notes in his brief, the comments to ER 1.7 state that 1.7(a) applies to conflicts of interest arising from the representation of opposing parties, while 1.7(b) applies to conflicts of interests arising from the representation of co-parties. Because this case involved the representation of co-parties, we agree with the Commission's finding that Respondent violated ER 1.7(b), which provides:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> > (1) the lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

The first step in analyzing whether Respondent violated ER 1.7(b) is to determine whether Respondent's representation of Client A was materially limited by Respondent's responsibilities to Fairfield. If Respondent's representation of Client A was not limited by his responsibility to Fairfield, there is no conflict. If, on the other hand, Respondent's representation was limited, then the rule requires that Respondent reasonably believe that his representation will not be adversely affected, and Respondent must obtain his client's consent after consultation. The comments to ER 1.7 provide some guidance in determining whether an impermissible conflict exists. The comments provide that:

> An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question.

Respondent urges the court to analyze the conflict of interest rules in terms of the substantive law applicable to the underlying claim asserted against Client A. Respondent takes great pains to show the similarity between Client A's and Fairfield's interests by showing the possible outcomes for the resolution of the RICO claim. Respondent's basic argument is that Client A faced no real expo-

sure from the RICO claim, which was founded on racketeering and actual fraud claims. Respondent claims that under either Fairfield's or Client A's version of the underlying events, Client A was not at risk because the claims were asserted against both Client A and Fairfield jointly and severally, and Fairfield had agreed to indemnify Client A for any joint judgment. This argument fails for a number of reasons.

Respondent conveniently forgets that when he agreed to represent Client A, Fairfield had agreed only to defend Client A; no mention was made concerning indemnification. Respondent obviously understood the difference between a promise to defend and a promise to indemnify. On the same day that he began representing Client A, Respondent wrote to Fairfield asking about its intentions regarding indemnification. In that letter, Respondent stated, "we have undertaken a duty to *defend* [Client A], but I believe such duty is obviously independent from a duty to pay a judgment." (Emphasis added.)

More importantly, nothing prohibited Nabours from amending the complaint and asserting a racketeering claim against Client A individually. Nabours thought that there was a strong possibility that he could get a judgment against Client A individually. And, from its answer to the complaint and its answers to the interrogatories, Fairfield's strategy appears to have been to lay responsibility for the representations about the priority-rent-back program at the doorstep of some other third party. Considering that Client A admitted making representations about the priority-rent-back program while Fairfield claimed that no such program existed, and that any representations to the contrary were done without Fairfield's knowledge or consent, Client A was the likely third party.

Not only is the position Fairfield adopted contrary to Client A's interests, but it is contrary to Client A's version of the facts. And, as the comments to ER 1.7 state, a substantial discrepancy in the parties' testimony is another basis for finding that a conflict of interest exists. As discussed above, Client A's and Fairfield's versions of the underlying events were contrary to each other. The substantial discrepancy between the co-parties' versions of events was evident from both the answers to the complaint and the answers to the interrogatories that each party filed and does not warrant further discussion.

The comments provide yet another basis for finding a conflict of interest in this case. The comments state that a conflict may exist when "substantially different possibilities of settlement of the claims or liabilities" exist. ER 1.7 (comments). Respondent made no effort to have Client A released from this suit. Yet, as was evident from the ease in which Client A's new attorney was able to get Client A released from the suit, Client A's potential for settlement was substantially greater than Fairfield's. Respondent's representation of both Client A and Fairfield, in light of their substantially different positions in terms of settlement, is yet another basis for finding a conflict of interest.

Why Respondent has such difficulty accepting that his representation of both Client A and Fairfield created an impermissible conflict of interest is beyond this court's understanding. Respondent need only recall the letter he wrote to Fairfield's general counsel to understand how he ran afoul of this ethical rule. On the day that he agreed to represent Client A, Respondent wrote the following to Fairfield's general counsel, Terry Flora:

> With respect to our representation of [Client A], I indicated on the phone that we had previously agreed that we would defend [Client A] since it is *to our obvious advantage* to assure that [Client A] is as friendly as possible to us.

(Emphasis added.) Client loyalty is at the heart of our conflict of interest rules. ER 1.7 (comments) ("Loyalty is an essential element in the lawyer's relationship to a client."). This letter clearly demonstrates where Respondent's loyalties lay: Respondent saw himself as being aligned with Fairfield—the paying client. And, his representation of Client A reflected his bias toward Fairfield and his lack of loyalty to Client A.

The record is replete with evidence showing that Respondent's joint representation

created an impermissible conflict of interest. Repeating every piece of supporting evidence would be redundant. Suffice it to say that based on the Committee's factual findings, adopted by the Commission and this court, we have no trouble finding that an impermissible conflict of interest arose from Respondent's joint representation of Client A and Fairfield.

Having found that a conflict existed, the question becomes whether Respondent reasonably believed that the conflict would not adversely affect his representation *and* whether Respondent obtained Client A's consent to the joint representation after full consultation. *See* ER 1.7(b). This court need not decide whether Respondent reasonably believed that his representation of Client A would not be adversely affected because Respondent failed to comply with the consent requirement necessary to represent a party when a conflict of interest is present.

■ The rule specifically provides that when the conflict arises from the representation of multiple clients in a single matter, the attorney must explain the implications, advantages, and risks of the common representation. ER 1.7(b). Client A testified that the only time Respondent mentioned a conflict of interest was during a meeting on September 10, 1987. According to Client A, Respondent informed Client A that there was a possibility that a conflict would arise and that, if a conflict arose, he would have to withdraw from representing Client A and Client A would have to seek other counsel. Respondent did not explain the concept of conflict of interest, what specific type of conflict might arise, or any of the advantages or risks that existed because of the joint representation. Moreover, Respondent neither advised Client A that he might have a cross-claim against Fairfield for indemnity nor informed Client A that Respondent might be constrained from raising certain defenses on Client A's behalf because of the joint representation. A mere mention of the possibility of a conflict of interest, without more, is not sufficient to meet the requirements of the ethical rules.

Because a conflict of interest arose from Respondent's joint representation of Client A and Fairfield and because Respondent failed to obtain Client A's informed consent to Respondent's continued representation, we find that Respondent violated ER 1.7(b).

### b. Ethical Rules 1.4(a) and (b)—Communication

■ Both the Committee and the Commission concluded that Respondent violated ERs 1.4(a) and (b), which provide:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

In the issue statement of his brief, Respondent questions whether there is "clear and convincing evidence to support a legal conclusion that respondent violated E.R. 1.4(a)." The only arguments Respondent presents, however, are that the Commission had not found that Respondent concealed information from Client A, that he abandoned Client A, or that he failed to keep Client A informed because of any "ulterior reason." None of these arguments has any bearing on whether or not Respondent violated ER 1.4(a). The issue under ER 1.4(a) is merely whether or not Respondent kept Client A reasonably informed about the status of the case.

This court, after independently reviewing the record, concludes that Respondent violated this ethical rule. Respondent represented Client A from June 26, 1987 to approximately October 22, 1988. According to his time sheets, Respondent had minimal contact with Client A during the 16 months that he represented Client A. Respondent met with Client A only one time, on September 10, 1987, during which time he tried to persuade Client A to "rethink" their position on their draft answers to interrogatories that conflicted with Fairfield's position. Respondent's billing reflects 11 calls to Client A for a total of 3 hours of phone conversation with Respondent. Despite sending Fairfield regular status letters on such topics as discovery,

legal research, and settlement negotiations, Respondent sent no such information to Client A. In fact, when asked whether he passed on any information regarding the status of the case to Client A after the September 10, 1987 meeting, Respondent admitted he did so "only indirectly through Fairfield." We have little trouble finding that Respondent failed to keep Client A reasonably informed, as required by ER 1.4(a).

The Commission found that Respondent violated ER 1.4(b) by failing to explain the litigation to Client A to the extent necessary to permit them to make informed decisions regarding Respondent's continued representation of Client A. Respondent challenges the Commission's finding that he violated ER 1.4(b), arguing that the evidence supporting this finding is "anything but clear and convincing." According to Respondent, the Commission must have been referring to his continued representation after the meeting on September 10, 1987. And, as far as Respondent is concerned, the evidence shows that he fully explained the implications of Client A's answers and thought that any conflicts about Client A's answers were resolved. Any violation of this rule, Respondent argues, was committed unwittingly.

Respondent's argument fails for a number of reasons. Despite his arguments to the contrary, nothing in the Commission's legal conclusion suggests that its Findings were limited to Respondent's disclosure efforts at the September 10, 1987 meeting. And, even if this were the legal conclusion that the Commission intended, this court, as "an independent arbiter of both the facts and law" in disciplinary matters, is not bound by either the Committee's or the Commission's legal conclusions. *See, e.g., In re Kersting,* 151 Ariz. at 172, 726 P.2d at 588.

Based on our review of the record, we easily find that Respondent violated ER 1.4(b). The record clearly shows that from the time Respondent agreed to represent Client A, Client A was kept singularly uninformed about the lawsuit. All of the decisions regarding the lawsuit were made by Fairfield and Respondent. Because Client A received so little information about the lawsuit, it necessarily follows that Respondent did not provide Client A with sufficient information to enable them to make informed decisions regarding the representation.

■ Moreover, Respondent once again misreads a scienter requirement into ER 1.4. The intentionality or unintentionality of an attorney's conduct is irrelevant in determining a violation of ER 1.4. The question is simply whether or not the attorney provided the client with sufficient information to enable the client to make an informed decision regarding the representation. In this case, we find that Respondent did not.

### c. Ethical Rule 3.3—Candor Toward Tribunal

■ Respondent also challenges the findings that he violated ER 3.3. The basis for the Committee's conclusion, which was later adopted by the Commission, was Respondent's conduct in using his own revision of Client A's draft answers to Nabours' interrogatories, along with Client A's verification for their handwritten answers, as support for Respondent's Reply to Opposition to Motion for Summary Judgment. In using these interrogatories, Respondent intended that the court consider his revised answers as representing Client A's position on the issues raised in the interrogatories. Yet, Respondent knew that Client A had not seen the revised answers to the interrogatories, some of which were directly contrary to Client A's draft answers. And, more importantly, Respondent submitted these interrogatories even after learning that Client A was claiming that Respondent had changed their answers to the interrogatories without their knowledge or consent.

Ethical Rule 3.3 provides in part:

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

. . . .

(4) except as required by applicable law, offer evidence that the lawyer knows to be false. . . .

Based on his interpretation of ER 3.3, Respondent argues that the rule requires this court first to analyze the truth of the evidence that he submitted to the court—in this

case the answers to the interrogatories—and then determine whether Respondent knew that the answers he submitted were false. Respondent is arguing, in a convoluted way, that Client A's handwritten draft answers were not true, or at least that Respondent believed they were not true, and that the answers Respondent submitted to the court were, to the best of his knowledge, true. Thus, according to Respondent, because the evidence he submitted to the court either was true or he thought it was true, he did not violate ER 3.3.

Although a novel argument, Respondent fails to grasp the nature of the misconduct that gave rise to this violation. The false statement or false evidence that Respondent offered to the court was that the answers he submitted represented Client A's position. Respondent was well aware that the "revised" answers he submitted as Client A's did not represent Client A's position. Based on our review of Respondent's actions, we unquestionably find that Respondent violated ER 3.3; that Respondent fails to understand this simple proposition is indeed troubling.

### d. Ethical Rules 3.4 and 4.1—Fairness to Opposing Party and Truthfulness in Statements to Others

■ The State Bar urges the court to find that Respondent's conduct in changing Client A's draft answers to the interrogatories and submitting them with the signed verification also violated ERs 3.4(a), 3.4(b), and 4.1. Although these violations were alleged in the complaint, neither the Committee nor the Commission concluded that Respondent violated these ethical rules. We agree with the Committee and the Commission that the evidence presented is insufficient to find that Respondent's conduct in connection with the interrogatories violated ERs 3.4(a), 3.4(b), or 4.1.

We recognize that it seems anomalous that Respondent's use of the interrogatories and the signed verification violated his duty of candor to the court, ER 3.3, but not his duty to deal fairly with the opposing party and counsel or his duty to be truthful in statements to others. But, the factual development that resulted in the violation of ER 3.3 is not necessarily applicable in analyzing whether Respondent violated ERs 3.4(a), 3.4(b), and 4.1.

All of the ethical rules in question—3.3, 3.4(a), 3.4(b), and 4.1—expressly or impliedly require some sort of knowledge on the part of the attorney. The factual development that resulted in the violation of ER 3.3 was that Respondent submitted the interrogatories to the court *after* learning that Client A was disclaiming the answers. At the time that Respondent submitted the interrogatories to opposing counsel, however, Respondent had not received notice that Client A was claiming that the revised answers were untrue.

Although Client A claims that Respondent knew that they never wavered in their claim that they represented the existence of the priority-rent-back program at Fairfield's direction, Respondent vehemently claims that the answers he submitted reflected the agreement that the parties reached during their September 10, 1987 meeting. To support his claim, Respondent introduced affidavits from a number of Fairfield's representatives who attended the September 10 meeting. All of the affidavits support Respondent's claim that he was authorized to change Client A's answers as he did. Given the conflicting testimony presented, we cannot say that there is clear and convincing evidence that Respondent knew that the answers he submitted did not represent Client A's position when he sent them to opposing counsel. Accordingly, we find no violation of ERs 3.4(a), 3.4(b), or 4.1.

### e. Ethical Rule 8.4—Misconduct

Respondent objects to any finding that he violated ERs 8.4(c) and (d). His sole objection is procedural in nature. Although the State Bar alleged that Respondent's conduct in the Fairfield litigation violated ERs 8.4(c) and (d), the Committee reached no such conclusion. The Commission, in its report, however, stated: "[t]he Commission, by unanimous vote of eight aye, adopted the Committee's Findings of Fact and Conclusions of Law that Respondent violated ERs 1.4(a), 1.4(b), 1.7(b), 3.3, 8.4(c), and 8.4(d), as alleged in Count One of the complaint against Re-

spondent." Because the Committee did not specifically conclude that Respondent violated ER 8.4(c) or (d), Respondent argues that the Commission could not conclude that respondent violated ER 8.4(c) or (d). Respondent acknowledges that the Commission has the authority to modify the Committee's Findings of Fact and Conclusions of Law. He argues, however, that rule 53(d)(3), Arizona Rules of the Supreme Court, requires more than the conclusory statement contained in the Commission's report.

 Although the court prefers some discussion of the reasons for the Commission's modifications, the Commission's failure to provide this discussion in no way limits this court's ability to find this violation. Respondent forgets that in disciplinary matters, this court acts as an independent arbiter of both the facts and the law. *Neville,* 147 Ariz. at 108, 708 P.2d at 1299. After reviewing the record, we find by clear and convincing evidence that Respondent violated ERs 8.4(c) and (d).

### 3. Count Two

Because the facts in this count were undisputed, the Committee disposed of this issue by summary judgment, which was filed on September 18, 1990. The Commission adopted the Committee's Findings of Fact, which we also adopt and which are summarized below.

The Narramores sued Pic–N–Save and Del Monte Corp. for personal injuries that Mrs. Narramore sustained from an exploding can of enchilada sauce. Respondent represented the Narramores, and Michael Owen Miller represented the defendants in the action.

On September 13, 1988, after a jury trial, judgment was entered in favor of the Narramores and against Del Monte for the sum of $2,977.64. On October 17, 1988, after the time for filing an appeal had expired, Respondent wrote to Miller advising that he did not intend to appeal and asking Miller for payment of the tort judgment.

On October 28, 1988, Miller sent Respondent a letter with a check for $2,977.64. The check was from an insurance company and stated on its face: "FULL SATISFACTION OF JUDGMENT IN CASE OF NARRA-MORE VS DEL MONTE, CV 87–13534." The letter enclosed a satisfaction of judgment form and advised Respondent that the check should be cashed only upon the return of the executed satisfaction of judgment. Respondent received the letter, satisfaction of judgment, and the check on or about October 31, 1988. On November 21, Miller sent Respondent a follow-up letter reiterating that Respondent should not cash the check until he executed and returned the satisfaction of judgment. Miller also indicated in this follow-up letter that he would stop payment on the check if the satisfaction of judgment was not returned by December 12. Respondent did not respond to Miller's November 21 letter. He did, however, deposit the check in his trust account on December 1. On January 11, 1989, Miller unsuccessfully tried to place a stop payment order on the check. Miller wrote to Respondent on January 17, 1989, stating that the check had been cashed and that Respondent must return the satisfaction of judgment.

On February 7, after receiving no response from Respondent, Miller filed a motion to compel Respondent to sign and return the satisfaction of judgment. The court granted the motion to compel on March 13 and awarded Miller's client $250.00 in attorneys' fees. Respondent finally signed the satisfaction of judgment on March 21, and he ultimately paid Miller's clients the $250.00 from his own funds.

Based on these facts, both the Committee and the Commission concluded that Respondent violated ERs 1.15 and 3.2. Despite Respondent's arguments to the contrary, we find by clear and convincing evidence that Respondent violated these two rules.

### a. Ethical Rule 1.15—Safekeeping Property

The Committee and the Commission concluded Respondent was acting in the nature of a fiduciary for both his own and Miller's client when Respondent cashed the check that Miller sent him. Accordingly, because Respondent cashed the check without executing and returning the satisfaction of judgment as directed, both the Committee and

the Commission concluded that Respondent violated his fiduciary obligation to Miller's clients, in violation of ER 1.15.

▮ Respondent essentially argues that Miller's clients had no ownership interest in the check that Miller sent to Respondent because the judgment in the case was final and Miller's clients clearly owed Respondent's clients the money tendered. Accordingly, Respondent argues that because Miller's clients had no interest in the money tendered, ER 1.15 is inapplicable.

The court agrees with the Committee's analysis of the violation. Ethical rule 1.15 has three basic requirements. The rule requires a lawyer to: (a) "hold property of clients or *third persons* that is in a lawyer's possession in connection with a representation separate from the lawyer's own property," (b) "promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive," and (c) keep property in which both the lawyer and another person claim interests separated until there is an accounting and severance. ER 1.15 (emphasis added).

The comments to ER 1.15 specifically state that "[a] lawyer should hold property of others with the care required of a professional fiduciary." Fiduciary is defined as:

> [A] person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires.

. . . . .

*Black's Law Dictionary* 563 (5th ed. 1979). It was in this capacity that Miller sent Respondent the settlement check, specifically conditioning the cashing of the check upon Respondent's executing the satisfaction of judgment. In a sense, Respondent was acting in an escrow capacity. *See Black's Law Dictionary* 489 (5th ed. 1979) (defining escrow as the delivery of money by one party to the hands of a third person who is supposed to hold the money until the happening of a contingency or performance of a condition, after which the third person is to deliver the property to yet another party.) Trusting Respondent, Miller sent Respondent money that was to be used specifically to satisfy the judgment against his clients. Respondent's arguments to the contrary, the $2,997.64 was the "property of others" until Respondent complied with the conditions attached to the cashing of the check.

▮ As discussed above, the $2,997.64 check was the property of Miller's clients until Respondent executed and returned the satisfaction of judgment.[3] The rules required Respondent *to hold* that property separate from his own property. Respondent did not do this. Instead, Respondent violated the trust that Miller and Miller's clients placed in him by cashing the check and distributing the proceeds after Miller told Respondent that Miller was going to stop payment on the check because Respondent had failed to satisfy the condition attached to its tender. Accordingly, this court agrees with both the Committee and Commission that Respondent's handling of the $2,997.64 check violated ER 1.15.

b. Ethical Rule 3.2—Expediting Litigation

▮ Both the Committee and the Commission found that Respondent's delay in executing the satisfaction of judgment violated ER 3.2, which requires a lawyer to "make reasonable efforts to expedite litigation consistent with the interests of the client." Respondent argues that there was no violation because any delay in executing the judgment was "neither inconsistent with nor had anything to do with the interests of his client."

---

**3.** Respondent appears to be arguing that cashing a check marked "FULL SATISFACTION OF JUDGMENT IN CASE OF NARRAMORE VS DEL MONTE, CV 87–13534" constituted satisfaction of the underlying judgment. Respondent appears to be confusing the concepts of Accord and Satisfaction with satisfaction of judgment. Although marking a check "full satisfaction" may serve as release for a disputed claim arising in either contract or tort, it does not meet the technical requirements necessary to extinguish a judgment debt. As this court has previously stated, " '[s]atisfaction' is a technical term, and in its application to a judgment it means the payment of the money due on the judgment, which must be entered of record, and *nothing but this is a legal satisfaction of the judgment.*" *Rager v. Superior Coach Sales & Serv.*, 110 Ariz. 188, 191, 516 P.2d 324, 327 (1973) (emphasis added).

Respondent further argues that the litigation was over before he received the check; thus, Respondent argues his actions did not delay the litigation.

Once again Respondent has missed the mark. He adopts too narrow a definition of "litigation." Litigation is defined as a "[l]egal action, *including all proceedings* therein." *Black's Law Dictionary* 841 (5th ed. 1979) (emphasis added). A client's interest does not end with the entry of a judgment but ends with the completion of the legal action. This legal action was complete when the satisfaction of judgment was filed.

Moreover, Respondent misreads ER 3.2. That rule imposes an affirmative duty on lawyers to make reasonable efforts to expedite litigation. The caveat—consistent with the interests of the client—insures that a lawyer's efforts to expedite litigation do not conflict with the client's legitimate interests. The comments, however, make it clear that "delaying tactics" are discouraged. In analyzing whether a respondent violated ER 3.2, "[t]he question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay." ER 3.2 (comments). As was evident by the trial court's imposition of costs, no substantial purpose was served in forcing Miller to file a motion to compel Respondent to execute the satisfaction of judgment. This court, therefore, finds that Respondent's unjustifiable delay in executing the satisfaction of judgment violated ER 3.2.

c. Ethical Rule 8.4(d)—Conduct Prejudicial to the Administration of Justice

■ The State Bar alleged in its complaint that Respondent's conduct in connection with his handling of the Narramores' satisfaction of judgment check violated ER 8.4(d), which provides that "[i]t is a professional misconduct for a lawyer to: ... engage in conduct that is prejudicial to the administration of justice." Neither the Committee nor the Commission concluded that Respondent's conduct in connection with the satisfaction of judgment check violated ER 8.4(d). The State Bar urges this court to

find such a violation. We have little trouble doing so.

This court finds Respondent's handling of the satisfaction of judgment check not only offensive but prejudicial to the administration of justice. Respondent's behavior in cashing the check without executing the satisfaction of judgment as requested is inexcusable. Respondent specifically advised Miller that his clients did not intend to appeal and asked Miller to send the check for the judgment debt. Miller complied with Respondent's request, remitting the full amount of the judgment; Miller asked only that Respondent execute a satisfaction of judgment. Instead, Respondent forced Miller to file a motion to compel and unnecessarily delayed the process by approximately 5 months. This wasted not only Miller's time but the time of the court that ultimately had to issue an order directing Respondent to execute the satisfaction. Particularly galling is the fact that there was no reason for Respondent's refusal to execute the satisfaction of judgment.

Not only did Respondent unnecessarily burden the judicial system in this case, but this kind of behavior, if unchecked, can adversely affect the judicial system as a whole. The court encourages voluntary settlement of judgment debts. The type of behavior Respondent engaged in only encourages judgment debtors to force judgment creditors to resort to judicial proceedings to recover a judgment. This court will not condone this type of egregious conduct, which unnecessarily burdens an already overburdened judicial system. Accordingly, we find that Respondent's actions were prejudicial to the administration of justice and thus constituted professional misconduct, in violation of ER 8.4(d). *Cf. In re Gresham*, 318 Or. 162, 864 P.2d 360, 363 (1993) (attorney disciplined for neglecting to meet court imposed deadlines, which placed an additional and unnecessary burden on judicial system).

4. **Sanctions**

Both the Committee and the Commission recommended that Respondent be suspended for one year. The Commission further recommended that Respondent pay restitution

to Client A in the amount of $2,258.60, which represents the amount they paid to the attorney who took over their case. Respondent challenges these recommendations, urging a lesser sanction. The State Bar, on the other hand, urges the court to disbar Respondent.

The ultimate responsibility for deciding appropriate attorney discipline rests with this court. *Neville,* 147 Ariz. at 115, 708 P.2d at 1306 (citation omitted). In carrying out this responsibility, we are guided by the principle that "the purpose of bar discipline is not to punish the lawyer but to deter others and protect the public." *Kersting,* 151 Ariz. at 179, 726 P.2d at 595; *In re Coffey,* 171 Ariz. 544, 546, 832 P.2d 197, 199 (1992). We look to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (*Standards* ) for guidance in determining the appropriate sanction to impose. *In re Tarletz,* 163 Ariz. 548, 554, 789 P.2d 1049, 1055 (1990). The *Standards* set forth 4 factors that should be considered in determining an appropriate sanction: (1) the duty violated, (2) the lawyer's mental state, (3) the actual or potential injury caused by the lawyer's misconduct, and (4) the existence of aggravating or mitigating factors. *See* Standard 3.0.

### a. Aggravating and Mitigating Factors

Because the bulk of Respondent's challenges involve the Commission's findings of different aggravating and mitigating factors, which we adopt, we begin our analysis here.

The Committee found the following aggravating factors: (1) multiple violations of the Rules of Professional Conduct, (2) substantial experience in the practice of law, and (3) failure to directly acknowledge the wrongful nature of his conduct. The Commission found not only these 3 aggravating factors but 3 additional aggravating factors: (4) a dishonest or selfish motive, (5) vulnerability of the victim, and (6) indifference to making restitution.

Both the Committee and the Commission found Respondent's absence of prior disciplinary record and cooperation with the disciplinary proceedings to be mitigating factors.

The Committee, but not the Commission, also considered the effect of sanctions on Respondent's practice as a mitigating factor.

Respondent challenges the Commission's consideration of the 3 additional aggravating factors not found by the Committee, the applicability of each individual aggravating factor except for the multiple violations factor, and he also urges the court to consider the effect of the sanctions on his practice as a mitigating factor. We address each in turn.

### 1. Propriety of Considering Aggravating Factors Not Found by the Committee

Respondent first challenges the application of the 3 additional aggravating factors that the Commission, but not the Committee, found. Respondent seems to be arguing that, because the Committee did not find these 3 aggravating factors, the Commission is precluded from making such a finding. Respondent fails to consider rule 53, Arizona Rules of the Supreme Court, which enables the Commission to affirm, reverse or modify the Findings of Fact, Conclusions of Law or Recommendations before it. *See* rule 53(d)(3), Arizona Rules of the Supreme Court.

### 2. Substantial Experience

Respondent challenges the propriety of applying his substantial experience in the practice of law as an aggravating factor. The *Standards* specifically provide that substantial experience in the practice of law may be considered an aggravating factor. *See* Standard 9.22(i). Both the Commission and this court have routinely considered this as an aggravating factor, according it the proper weight when determining an appropriate sanction. In light of Respondent's unblemished disciplinary record during those same past 10 years, *see* Standard 9.32(a), we find that any aggravating effect of his substantial experience in the practice of law is offset by the mitigating effect of his prior, discipline-free record. Accordingly, we conclude that this factor is entitled to no weight.[4]

---

**4.** Despite its frequency, this is the first time that the practice of considering "substantial experi-

ence in the practice of law" as an aggravating factor has been questioned. Respondent ap-

### 3. Selfish or Dishonest Motive

Respondent challenges the Commission's finding of "a dishonest or selfish motive" as an aggravating factor. Respondent argues that this factor is not applicable because neither the Committee nor the Commission found that he violated ER 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Not only is Respondent's argument moot because this court concluded that he violated ER 8.4(c), but Respondent's analysis of this aggravating factor is flawed.

This factor speaks in terms of "motive," not conduct. Income from Fairfield represented 20% of Respondent's gross revenue. Respondent's interest in protecting Fairfield's position, and thus a large source of his revenue, was obvious from the beginning of his representation of Client A. We need only remember Respondent's letter to Fairfield on the day that he agreed to represent Client A to see where Respondent's interests lay.[5] We therefore agree with the Commission that Respondent represented both Client A and Fairfield, notwithstanding the obvious conflict of interest, for selfish reasons.

### 4. Vulnerability of Victim

Respondent argues that as an experienced, licensed real estate broker with a college degree, Client A was not a vulnerable victim. We disagree. A victim's vulnerability turns not on a person's educational background or work experience, but rather on the situation.

As Respondent has repeatedly noted throughout his brief, this case involved very complex litigation. And, as we previously noted, the parties had substantially different possibilities for settling the claims or liabilities at issue. Client A had no special knowl-edge or experience that would alert him to these possibilities; instead, Client A was dependent upon Respondent. Respondent was responsible for recognizing that a conflict existed and that Client A's interests might have been better served by obtaining separate representation and pursuing a different strategy. In fact, considering the difficulty that Respondent has had in recognizing that a conflict of interest existed, it is ludicrous for Respondent to argue essentially that Client A was not vulnerable because his education and experience should have alerted him to the problems inherent in Respondent's joint representation of Client A and Fairfield. Under these circumstances, this court would be remiss in finding that Client A was not vulnerable merely because Client A was college educated and a licensed real estate broker. Accordingly, we agree with the Commission that vulnerability of the victim is an aggravating factor.

### 5. Indifference to Making Restitution

Respondent also challenges the Commission's findings about his indifference to making restitution. Respondent argues that because the Committee did not recommend restitution as a sanction, the record that the Commission reviewed obviously contained no evidence relating to an indifference to making restitution. We disagree and find that the evidence is clear that Respondent was indifferent to making restitution.

Client A testified that they incurred fees of $2,258.60 when they hired Eikleberry as their new attorney. Client A also testified that they did not have the funds to pay their attorney in full but were paying the balance over time. Respondent did not contribute anything toward these costs. His failure to make restitution is consistent with his continuous denial of misconduct. Furthermore, Respondent's current challenge to the impo-

---

peared to "hint" at an overall challenge to the continued use of this factor, questioning why his 10 years of practice is considered an aggravating factor. He did not, however, fully develop an overall challenge to this factor. And, because we concluded that the effect of this factor is offset by Respondent's unblemished disciplinary record over the same 10 years, we need not address his challenge. We take no position, however, on whether or how this factor should be considered in the disciplinary process.

**5.** In this letter, Respondent wrote: "With respect to our representation of [Client A], I indicated on the phone that we had previously agreed that we would defend [Client A] since it is *to our obvious advantage* to assure that [Client A] is as friendly as possible to us." (Emphasis added.)

sition of restitution makes his entire argument moot. In his opening brief, Respondent argues that requiring him to pay the costs incurred by Client A's new attorney is inappropriate because the new attorney "would never have done what she did," "had she not reached [an] erroneous conclusion [of law]." Respondent's current argument and his past actions exhibit a clear indifference to making restitution. We therefore adopt the Commission's conclusion that Respondent was indifferent to making restitution.

### 6. Refusal to Acknowledge the Wrongfulness of His Actions

 Respondent further argues that his privilege against self-incrimination was violated by our using his failure to acknowledge the wrongful nature of his conduct as an aggravating factor. Respondent asserts that criminal law principles, which reject the use of a defendant's refusal to admit guilt to enhance the defendant's punishment, should apply in disciplinary proceedings. He argues that to penalize him for unsuccessfully defending himself coerces him either to "confess" or run the risk of an increased sanction and this, Respondent argues, violates his right against self-incrimination.

Although Respondent failed to cite any cases discussing the extent and determination of an attorney's right against self-incrimination in disciplinary proceedings, this issue has been extensively litigated and has been the subject of numerous commentaries. *See, e.g.,* Annot., *Extent and Determination of Attorney's Right or Privilege Against Self-Incrimination in Disbarment or Other Disciplinary Proceedings—Post-Spevack Cases,* 30 A.L.R. 4th 243 (1984). And, our research shows that Respondent's arguments are meritless.

The Fifth Amendment of the United States Constitution provides: "No person ... shall be compelled in *any criminal case* to be a witness against himself, ...." (Emphasis added.) This provision is made applicable to the states by the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964). Article 2, § 10 of the Arizona Constitution contains a substantially identical provision.

The United States Supreme Court has determined that the sole concern of the self-incrimination clause is whether a witness is forced to give testimony that will lead to the imposition of penalties affixed to criminal acts. *Ullmann v. United States,* 350 U.S. 422, 438–39, 76 S.Ct. 497, 506–07, 100 L.Ed. 511 (1956); *accord Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). Thus, in this case, where the only possible penalty is disciplinary sanctions,[6] the salient constitutional inquiry is whether disciplinary sanctions are "penalties affixed to criminal acts." Courts that have considered this question have unanimously responded negatively. *See In re Daley,* 549 F.2d 469, 476 n. 6 (7th Cir. 1977) (citations omitted).

As this court has repeatedly stated, "the objective of disciplinary proceedings is to protect the public, the profession and the administration of justice and not to punish the offender." *In re Kastensmith,* 101 Ariz. 291, 294, 419 P.2d 75, 78 (1966). The function of state bar proceedings is not to determine whether specific conduct of an attorney violates the criminal law, but whether the attorney retains the attributes necessary to fulfill an attorney's responsibilities to the court that licensed him, as well as to the public. *E.g., Daley,* 549 F.2d at 475. Because the primary function of state bar disciplinary sanctions is remedial, the right against self-incrimination does not attach when disciplinary sanctions are the only penalties to which a respondent is exposed. *See, e.g., Daley,* 549 F.2d at 476. Accordingly, Respondent's right against self-incrimination does not proscribe our using his failure to acknowledge the wrongful nature of his conduct as an aggravating factor.

### 7. Effect of Sanctions on his Practice

 Respondent, citing *In re Ockrassa,* 165 Ariz. 576, 799 P.2d 1350 (1990), also

---

**6.** Respondent did not allege, nor did we find, that his testimony might incriminate him in some other criminal proceeding.

argues that the Commission wrongfully failed to consider the effect of sanctions upon his practice and livelihood as a mitigating factor. Respondent reads *Ockrassa* much too broadly. Were we to read *Ockrassa* in the manner suggested by Respondent, we would have to find that the effects of sanctions upon a respondent's practice and livelihood were mitigating factors in virtually every case.

Respondent correctly noted that the effect of sanctions upon an attorney's practice and livelihood is not listed as a mitigating factor in the *Standards*, nor does this court believe that this factor should be considered mitigating. Granted, this court considered the effect of sanctions when we disciplined Ockrassa; however, we did so only to avoid imposing the ABA minimum recommended sanction.

The *Standards* suggest that, when a suspension is warranted, a minimum 6–month suspension is generally necessary to protect the public. *See* Standard 2.3 Commentary. Although acknowledging that in some cases an attorney could show rehabilitation in less than 6 months, the *Standards* state that it is preferable to suspend an attorney for at least 6 months to ensure effective demonstration of rehabilitation. The reason for the 6–month minimum suspension has to do with protecting the public. A short-term suspension works somewhat in the manner of a fine. Accordingly, every suspension carries with it "pain" for the suspended attorney. This "pain" is a necessary element of any suspension because it serves as both a general and specific deterrent to future misconduct. The primary justification for the minimum 6–month suspension is that "[w]hen shorter suspensions are imposed, lawyers can merely delay performing the requested services." Standard 2.3 Commentary. Thus, the effect of a shorter sanction is to merely inconvenience the client because the disciplined lawyer ultimately collects the fees. *Ockrassa* involved the suspension of a public attorney. After reviewing Ockrassa's violations and considering the applicable aggravating and mitigating factors, this court concluded that a suspension was warranted. *Ockrassa*, 165 Ariz. at 580, 799 P.2d at 1354. We also concluded, however, that Ockrassa was one of those attorneys who could be rehabilitated in less than 6 months. In justifying a shorter suspension for Ockrassa, we focused on the nature of a public lawyer's practice. Because of the nature of Ockrassa's practice, we concluded that the concerns motivating the ABA's recommended 6–month minimum suspension were not applicable. *See Ockrassa*, 165 Ariz. at 580, 799 P.2d at 1354. Accordingly, we adopted the 90–day suspension recommended by both the Committee and the Commission. This court did not intend for *Ockrassa* to be read as implying that the effect of sanctions on an attorney's livelihood and practice should be considered a mitigating factor.

In Respondent's case, the court agrees with both the Committee and the Commission that a minimum one-year suspension is required to effectuate the goals of attorney discipline. Accordingly, it would be inappropriate to consider the effect of the sanctions on Respondent's livelihood as a mitigating factor.

Having rejected all of Respondent's challenges to the Commission's findings of aggravating and mitigating factors, we adopt the Commission's findings. Accordingly, we find that the following aggravating factors are applicable in this case: (1) multiple violations of the Rules of Professional Conduct; (2) substantial experience in the practice of law—however, we find this factor *de minimus*; (3) failure to directly acknowledge the wrongful nature of his conduct; (4) a dishonest or selfish motive, (5) vulnerability of the victim; and (6) an indifference to making restitution. We also find that the following mitigating factors are applicable: (1) absence of prior disciplinary record, and (2) cooperation with the disciplinary proceedings.

### b. ABA Standards—Recommended Sanctions

■ We now look to the sanctions recommended in the *Standards*, because they embody the remaining three factors that should be considered in determining appropriate sanctions: (1) the duty violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct. *See* Standard 3.0 Commentary

(recommended sanctions for breaches of duty owed to clients are tailored to lawyer's mental state and injury or potential injury to client); *see also In re Levine,* 174 Ariz. 146, 170, 847 P.2d 1093, 1117 (1993) (*Standards* are useful tool in determining proper sanction). Based on Respondent's violations, the following Standards apply:

(1) as to Respondent's violation of ER 1.7, Standard 4.32; [7]

(2) as to Respondent's violation of ER 1.4, Standard 4.43;

(3) as to Respondent's violation of ER 3.3, Standard 6.12;

(4) as to Respondent's violations of ERs 8.4(c) and (d), Standard 6.12; and

(5) as to Respondent's violation of ER 1.15, Standard 4.14.

With the exception of Respondent's violation of ER 1.4, which calls for a reprimand, and his violation of ER 1.15, which calls for an admonition, the bulk of his violations call for suspension. Suspension is clearly warranted in this case.

In determining the length of the suspension to impose, the Committee and the Commission considered the applicable aggravating and mitigating factors. Despite the differences in their conclusions as to the applicable aggravating and mitigating factors, both the Committee and the Commission agreed that a one-year suspension was warranted. As previously noted, we adopt the Commission's findings as to the applicable aggravating and mitigating factors. We also agree that a one-year suspension is warranted. Respondent challenges this suspension as disproportionately long, while the State Bar argues that it is too short.

Because we are guided "by the principle that an effective system of professional sanctions must have internal consistency," we examine sanctions imposed in cases factually similar to Respondent's. *See Pappas,* 159

Ariz. at 526, 768 P.2d at 1171 (discussing *Standards* preface and Standard 1.3). We have long recognized, however, that "[t]he discipline in each situation must be tailored for the individual case; neither perfection nor absolute uniformity can be achieved." *In re Wines,* 135 Ariz. 203, 207, 660 P.2d 454, 458 (1983); *see, e.g., Levine,* 174 Ariz. at 174, 847 P.2d at 1121.

Respondent's argument that a one-year suspension is disproportionately long fails for two reasons. First, one of Respondent's claims supporting his argument is that the recommended sanction is based on various erroneous conclusions that the Commission reached concerning the Ethical Rules Respondent violated and the aggravating and mitigating factors that existed. We disposed of these arguments above when we adopted the Commission's Findings regarding the violations and the aggravating and mitigating factors. Second, the cases Respondent cites to demonstrate the alleged disproportionality are factually distinguishable from his case.

Respondent cites numerous cases involving multiple violations in which lesser sanctions were imposed. As Respondent noted, however, none of the cases cited involved conflict of interest violations. Thus, we find these cases of no use in this analysis. The cases that Respondent cited in which a conflict of interest violation occurred and lesser sanctions were imposed are also distinguishable.

For instance, Respondent cites *In re Neville,* 147 Ariz. 106, 708 P.2d 1297 (1985), and *In re Petrie,* 154 Ariz. 295, 742 P.2d 796 (1987), conflict of interest cases in which we imposed only a censure. Both of these cases, however, were characterized by a relatively undefined nature of the lawyer's relationship with the client, and in each case, the lawyer apparently acted in good faith. In Respondent's case, Client A was unquestionably Respondent's client. Moreover, neither *Neville*

---

7. Respondent challenges the Commission's reliance on Standard 4.32, arguing that the application of this standard depends on a factual determination that Respondent knew of a conflict of interest. Respondent is correct that the rule speaks in terms of knowledge, the requisite mental state for this particular standard. *See* Standard 4.32. Knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Standards,* Definitions. Whether Respondent knew or did not know the actual conflict existed is irrelevant because he was aware of the nature of the attendant circumstances. Accordingly, Standard 4.32 applies to Respondent's violation of the conflict of interest rules.

nor *Petrie* involved the number of violations, the types of violations, or the same aggravating or mitigating factors present in Respondent's case.

Respondent also cites *Ockrassa* in support of his position. 165 Ariz. 576, 799 P.2d 1350. In that case, we imposed a 3–month suspension when an attorney represented the state in a criminal prosecution against his former client. *See Ockrassa*, 165 Ariz. at 576–77, 799 P.2d at 1350–51. *Ockrassa* is distinguishable because, unlike Respondent's case, Ockrassa committed only one violation and only one aggravating factor applied. 165 Ariz. at 579–80, 799 P.2d at 1353–54. Finally, Respondent cites *In re Miranda*, 170 Ariz. 270, 823 P.2d 1278 (1992), in which we imposed a 3–month suspension on an attorney who violated the conflict of interest rules. Although *Miranda* involved 4 violations, the conflict of interest violation occurred when Miranda entered a business transaction with his client without giving the client the opportunity and notice that the client should seek independent legal counsel and without obtaining his client's written consent to proceed with the transaction. 170 Ariz. at 271–73, 823 P.2d at 1279–80. There was no finding that Miranda's interest in the transaction was other than fair or reasonable to the client. This is a much different conflict of interest violation from that committed by Respondent. Moreover, mitigating factors in *Miranda*, not present in Respondent's case, also supported the lesser sanction. 170 Ariz. at 273, 823 P.2d at 1281.

Having considered Respondent's disproportionality arguments, we turn now to the State Bar's arguments calling for disbarment. In support of its argument, the State Bar cites *In re Pappas*, 159 Ariz. 516, 768 P.2d 1161, in which this court imposed a 5–year suspension. The State Bar claims that Respondent's behavior is more egregious than that of Pappas. We do not find this to be true.

Pappas engaged in business transactions with his clients that were disadvantageous to his clients while being advantageous to himself. *Pappas*, 159 Ariz. at 524, 768 P.2d at 1169. Throughout his business dealings with various clients, Pappas engaged in blatant self-dealing. *Pappas*, 159 Ariz. at 524, 768 P.2d at 1169. When his house of cards collapsed, Pappas misrepresented the financial picture to his clients while he continued to line his own pockets. *See Pappas*, 159 Ariz. at 528, 768 P.2d at 1173 (misrepresenting extent of assets available for liquidation and then selling remaining assets on liquidation to companies in which he had interest). Respondent's behavior was a far cry from that exhibited by Pappas. Although Respondent's joint representation of Client A and Fairfield violated the conflict of interest rule, Respondent believed that Client A was not at risk. Moreover, the sanctions imposed on Pappas reflect an important aggravating factor missing in this case—failure to cooperate with disciplinary authorities. *Pappas*, 159 Ariz. at 527, 768 P.2d at 1172 ("[f]ailure to cooperate with disciplinary authorities is a significant aggravating factor"); *see In re Wade*, 168 Ariz. 412, 814 P.2d 753 (1991) (imposing 4–year suspension for conflict of interest violation when attorney willfully obstructed disciplinary process).

Because the conflict of interest cases that the court has decided thus far are factually distinguishable from the case at bar, we are faced with determining a sanction that will effectuate the goals of attorney discipline. We agree with both the Committee's and the Commission's conclusions that a one-year suspension is an appropriate sanction for Respondent's misconduct.

### c. Credit for Time of Self–Imposed Withdrawal From Practice of Law

Respondent urges the court to credit him with the time that he has voluntarily withdrawn from practice, citing as support *In re Murray*, 159 Ariz. 280, 767 P.2d 1 (1988), and *In re Rivkind*, 164 Ariz. 154, 791 P.2d 1037 (1990). According to Respondent, he closed his office on August 1, 1991 after learning that the Committee recommended that he be suspended for one year. Respondent argues that his voluntary withdrawal from the practice of law is a sufficient sanction in that the public has been protected during the period that Respondent voluntarily withdrew from practice.

As the State Bar noted in its supplemental brief, Respondent raised this argument for the first time on his appeal to this court. Although Respondent submitted an affidavit in his reply brief averring that he closed his office on August 1, 1991, no evidence in the record on appeal supports his claim. In fact, the State Bar argues that Respondent had not withdrawn from the practice of law. Notwithstanding that it too is outside the record, the State Bar included a copy of an advertisement that was run in the April 1992 edition of the *Maricopa Lawyer* in which Respondent was advertising his services. Regardless of the parties' claims, our review is limited to the record on appeal. *See* rule 53(e), Arizona Rules of the Supreme Court; *cf. Gold v. Killeen,* 50 Ariz. 126, 134, 69 P.2d 800, 804 (1937) (citations omitted) (limiting appellate review in civil case to record). Because no evidence in the record supports his claims, we reject Respondent's argument that he should be credited with the time that he voluntarily withdrew from the practice of law.[8]

### d. Additional Sanctions

The court is particularly concerned with Respondent's failure to acknowledge the wrongfulness of his conduct. Respondent has contested these charges at every step of the process and still fails to understand how his conduct ran afoul of the ethical rules. Respondent's failure to comprehend what was apparent to 14 people[9] disturbs this court because Respondent is likely to repeat that which he fails to understand. Therefore, as a condition of reinstatement, we re-

quire Respondent to successfully complete a course in ethics at an accredited college of law and pass the Multistate Professional Responsibility Examination. And, to further protect the public from a repeat of Respondent's unprofessional conduct, we also require Respondent to complete the Professionalism Course offered by the State Bar of Arizona.

### B. *Costs and Expenses*

We now address Respondent's objections to the assessment for costs and expenses incurred by the State Bar. Respondent's objections are twofold. First, he objects to the assessment for various expenses that the State Bar incurred during this disciplinary action. Specifically, Respondent objects to the assessment for screening costs and expenses, staff investigator costs, bar counsel expenses, photocopies, binders, legal pads, and office supplies. Respondent argues that the court's power to assess costs, which are defined as "all sums taxable as such in a civil action," and expenses, which are defined as "all obligations in money, other than costs, necessarily incurred by the state bar in the complete performance of its duties under these rules," is limited to costs that may be taxed in a civil action. *See* rules 46(g)(7) and (9), Arizona Rules of the Supreme Court. Alternatively, Respondent argues that the assessment for expenses outside those recoverable in a civil action is a form of punishment, which is contrary to the stated purpose of lawyer discipline. Second, Respondent objects to the amounts requested for specific

---

**8.** Having rejected Respondent's arguments on procedural grounds, it is unnecessary to discuss the merits of his contention that an attorney should be credited with the time during which the attorney voluntarily withdrew from the practice of law. The court cautions others against interpreting our decision as implying that the time an attorney voluntarily withdraws from practice should be credited against any suspension imposed. The facts in both *Murray* and *Rivkind* were unique, warranting this otherwise unusual treatment. *See In re Murray,* 159 Ariz. 280, 283, 767 P.2d 1, 4 (1988) (crediting attorney with one year toward suspension imposed based on his two-year, self-imposed suspension, the length of which was due, in part, to State Bar's delay in instituting formal proceedings); *In re Rivkind,* 164 Ariz. 154, 160, 791 P.2d 1037, 1043 (1990) (imposing retroactive suspension covering

time attorney was suspended from practice by court order).

An attorney who seeks credit for the time of a "voluntary withdrawal" from the practice of law against a period of enforced suspension should withdraw only pursuant to a stipulation with the State Bar or an order of this court. In this way, the State Bar and this court can set appropriate conditions for the withdrawal and supervise or at least observe the withdrawal.

**9.** On Count One, the 3-member Committee, the 8-member Commission, and this 3-member panel unanimously concluded that Respondent's conduct violated the conflict of interest rules, communication rules, and the rules governing candor to the court.

categories of costs and expenses. Respondent argues that the amount requested for hearing transcripts is unreasonable and that certain charges are duplicative.

### 1. Objection to Assessment of Expenses that Would Not be Recoverable in a Civil Action

In his initial objection to the State Bar's statement of costs and expenses, Respondent challenged the court's authority to regulate the legal profession, stating that "[t]here is no constitutional provision granting the Supreme Court the power to regulate the legal profession, and there are no longer any statutory provisions giving it such power." Respondent appears to have retreated from this position in his reply memorandum, conceding that the court has the power to regulate the legal profession. Respondent now argues that: (1) the court exceeded the scope of its authority when it promulgated rule 52(a)(8), which requires the court to impose a money judgment for the State Bar's costs and expenses on a disciplined attorney; and (2) the assessment of expenses not otherwise collectible in a civil action constitutes a form of punishment, which is contrary to the purpose of attorney discipline.

#### a. Court's Power to Assess Costs and Expenses

 Despite acknowledging that the court has the power to regulate the legal profession, Respondent fails to appreciate the scope of the court's power in this area. We have declared repeatedly "that the practice of law is a matter *exclusively* within the authority of the Judiciary." *Hunt v. Maricopa County Employees Merit Sys. Comm'n,* 127 Ariz. 259, 261, 619 P.2d 1036, 1038 (1980) (emphasis added); *see, e.g., In re Bailey,* 30 Ariz. 407, 411–12, 248 P. 29, 30–31 (1926).[10] The judiciary's authority to regulate and control the practice of law is universally accepted and dates back to the year 1292. *State Bar of Arizona v. Arizona Land Title & Trust Co.,* 90 Ariz. 76, 84, 366 P.2d 1, 7

(1961); *see Hunt,* 127 Ariz. at 262, 619 P.2d at 1039 (listing cases from numerous jurisdictions recognizing judiciary's authority to regulate and control practice of law); *see generally* Blewett Lee, *The Constitutional Power of the Courts Over Admission to the Bar,* 13 Harv.L.Rev. 233–55 (1899); Thomas M. Alpert, *The Inherent Power of the Courts to Regulate the Practice of Law: An Historical Analysis,* 32 Buff.L.Rev. 525 (1983). Because the judiciary's authority to regulate the practice of law is a widely accepted premise, we, along with other courts that have recently addressed this issue, have tended merely to pronounce our authority to regulate the practice of law without explaining the source of this power. *See, e.g., In re Lewkowitz,* 70 Ariz. 325, 329, 220 P.2d 229, 231 (1950). Thus, a brief explanation of the source of our power and the extent of our authority is appropriate.

 As we stated in *Hunt,* "[t]he determination of who shall practice law in Arizona and under what condition is a function placed by the state constitution in this court." 127 Ariz. at 261–62, 619 P.2d at 1038–39. Our authority to regulate the practice of law is found in articles 3 and 6 of the Arizona Constitution. Article 6, § 1 vests *"judicial power"* in "an integrated judicial department...." Article 3 provides:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Under article 3, each branch of government is independent, and no department may exercise powers belonging to the others. *Ahearn v. Bailey,* 104 Ariz. 250, 252, 451 P.2d 30, 32 (1969). Thus, the judicial department alone is able to exercise "judicial power." *See Ahearn,* 104 Ariz. at 252, 451 P.2d at 32.

---

10. *See also Ex parte Secombe,* 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856) ("[I]t has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed.").

Our constitution does not expressly grant any of the three departments of government the power to define and regulate the practice of law. However, courts that have interpreted constitutional provisions identical or similar to ours consistently have found that the power to regulate the practice of law belongs to the judicial department. *See, e.g., In re Day,* 181 Ill. 73, 54 N.E. 646, 651–52 (1899); *In re Integration of Nebraska State Bar Ass'n,* 133 Neb. 283, 275 N.W. 265, 266–68 (1937); *State v. Cannon,* 206 Wis. 374, 240 N.W. 441, 445, 448–50 (1932); *Integration of Bar Case,* 244 Wis. 8, 11 N.W.2d 604, 619 (1943).

The Nebraska Supreme Court provided a thoughtful discussion of its constitutional power to regulate the practice of law when the court's rules integrating the State Bar were challenged as unconstitutional. *Nebraska State Bar,* 275 N.W. at 265. Nebraska's constitutional provisions are very similar to Arizona's provisions. *Compare* Neb. Const. Art. 5, § 1,[11] and Art. 2, § 1,[12] with Ariz. Const. art. 6, § 1, and art. 3. As the Nebraska Supreme Court explained, "[i]t is a fundamental principle of constitutional law that each department of government, whether federal or state, has, without any express grant, the inherent right to accomplish all *objects naturally within the orbit of that department,* not expressly limited by the fact of the existence of a similar power elsewhere or the express limitations in the constitution." *Nebraska State Bar,* 275 N.W. at 266 (emphasis in original) (citations omitted); *see, e.g., State ex inf. Hadley v. Washburn,* 167 Mo. 680, 67 S.W. 592, 594–95 (1902). The court concluded, therefore, that "[i]n the absence of an express grant of [the power to regulate the practice of law] to any one of the three departments, [the power] must be exercised by the department to which it naturally belongs...." *Nebraska State Bar,* 275 N.W. at 266. In deciding which department the power to regulate the practice of law

naturally belonged, the court noted that "[t]he primary duty of courts is the proper and efficient administration of justice." *Nebraska State Bar,* 275 N.W. at 268. The court concluded that "[t]he practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to define and regulate its practice naturally and logically belongs to the judicial department...." *Nebraska State Bar,* 275 N.W. at 268; *see also, e.g., Ex parte Garland,* 71 U.S. (4 Wall.) 333, 379, 18 L.Ed. 366 (1866) (attorneys are officers of court "whose duties relate almost exclusively to proceedings of a judicial nature").

This analysis applies equally to Arizona's Constitution. Thus, the combination of article 3, which creates three separate government departments, and article 6, § 1, which vests judicial power with the judicial department, confers upon this court the power to discipline members of the bar.

 Arizona's Constitution, however, provides an even clearer directive in this area. Article 6, § 3, provides that "[t]he Supreme Court shall have administrative supervision over all the courts of the State." Administrative is defined as:

Connotes of or pertains to administration, especially management, as by *managing or conducting, directing, or superintending, the execution, application or conduct of persons* or things. Particularly, having the character of executive or ministerial action. In this sense, administrative functions or acts are distinguished from such as are judicial.

*Black's Law Dictionary* 42 (5th ed. 1979) (emphasis added) (citations omitted). Administrative supervision contemplates managing the conduct of court personnel. *See Mann v. Maricopa County,* 104 Ariz. 561, 565, 456 P.2d 931, 935 (1969). Attorneys are

**11.** This provision reads in part: "The judicial power of the state shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts inferior to the supreme court as may be created by law...."

**12.** This provision reads: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others except as hereinafter expressly directed or permitted."

universally recognized as "officers of the court." *Garland,* 71 U.S. (4 Wall.) at 378–79; *see, e.g., Day,* 54 N.E. at 650–51; *In re Application to Practice Law,* 67 W.Va. 213, 67 S.E. 597, 601 (1910); *In re Wren,* 79 Ariz. 187, 191, 285 P.2d 761, 763 (1955). And, as officers of the court, attorneys are "amenable to [the court] as their superior." *Nebraska State Bar,* 275 N.W. at 267; *see Garland,* 71 U.S. (4 Wall.) at 378–79. Through the disciplinary process, we are exercising our constitutionally granted power to manage the conduct of court officers.

Similarly, article 6, § 5(5), is another constitutional provision empowering this court to admit and discipline attorneys. This provision provides that this court has the "[p]ower to make rules relative to all procedural matters in any court." The admission and subsequent discipline of an attorney are some of the most basic procedural matters before any court.

On numerous occasions, this court has had to determine whether a matter is procedural. *See, e.g., State v. Fletcher,* 149 Ariz. 187, 191, 717 P.2d 866, 870 (1986). In doing so, this court has distinguished procedural from substantive law, stating:

> Procedural, adjective or remedial law is that portion of the law which prescribes the *method of enforcing a right or obtaining redress* for the invasion of that right. Substantive law, on the other hand, is that portion of the law which *creates, defines and regulates rights.*

*Fletcher,* 149 Ariz. at 191, 717 P.2d at 870 (emphasis in original); *see also Daou v. Harris,* 139 Ariz. 353, 358, 678 P.2d 934, 939 (1984); *Black's Law Dictionary* 1083 (5th ed. 1979). In promulgating rules prescribing the "method of enforcing a right or obtaining redress for the invasion of that right," this court necessarily must determine first who is qualified to come before the court to perform this task. As courts, including ours, have repeatedly stated in one form or another, the purpose of the State Bar's admission process and any subsequent disciplinary action is to protect the public by insuring that attorneys have the attributes necessary to fulfill their responsibilities to the court. *See, e.g., Kastensmith,* 101 Ariz. at 294, 419 P.2d at 78; *Daley,* 549 F.2d at 475–76. In this regard, the entire admission and discipline process can be viewed as procedural. Accordingly, article 6, § 5(5) is another constitutional source of our power over admission and disciplinary matters.

### b. Limitations on the Court's Power

Having explored the source of the court's power to discipline attorneys, we turn to the scope of the court's power and the ability of other branches of government to limit courts in the exercise of this power. Respondent argues that, when it enacted § 12–109, the legislature limited the State Bar to recovering only those costs that are taxable in a civil action. We reject Respondent's argument. The statute, by its terms, is inapplicable to disciplinary actions. Moreover, any attempt to interpret § 12–109 to encompass disciplinary actions would raise constitutional questions.

### 1. Effect of A.R.S. § 12–109 on Court's Power to Assess Costs and Expenses

Respondent argues that § 12–109 limits the court's power to assess costs and expenses in a disciplinary proceeding to only those costs that may be taxed in a civil action. Section 12–109 provides in part:

> The supreme court, by rules promulgated from time to time, shall *regulate pleading, practice and procedure in judicial proceedings in all courts* of the state for the purpose of simplifying such pleading, practice and procedure and promoting speedy determination of litigation upon its merits. The rules shall not abridge, enlarge or modify substantive rights of a litigant.

(Emphasis added.) Citing *State v. Griswold,* 8 Ariz.App. 361, 364, 446 P.2d 467, 470 (1968), Respondent maintains that costs can be imposed only when authorized by statute.[13] He therefore argues that the court is limited to assessing only those costs that may be taxed

---

**13.** Although respondent fails to specify which statute applies, the court presumes that he is referring to A.R.S. § 12–341, which enables a successful party in a civil action to recover costs, and to A.R.S. § 12–331, which defines what costs are recoverable in the supreme court.

in a civil action. Respondent argues that the "taxing of expenses" under rule 52(a)(8), Arizona Rules of the Supreme Court, is merely the taxing of costs under an expanded definition of costs. Thus, according to Respondent, because the rules expand the scope of costs that the State Bar can recover in a civil action, the rules modify Respondent's substantive rights, in violation of § 12–109. We reject this argument because § 12–109, by its terms, does not attempt to limit courts in the exercise of their power to regulate the practice of law.

The United States Supreme Court discussed the effect of § 12–109 on Arizona Supreme Court rules regulating the conduct of attorneys. *See Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). One of the issues addressed in *Hoover* was the effective date of an amendment to various rules regarding admission to the State Bar of Arizona. 466 U.S. at 561–62 n. 3, 104 S.Ct. at 1991–92 n. 3. The Court in *Hoover* rejected Respondent's argument that the legislature, through its enactment of § 12–109, limited the court's ability to make its amendments concerning the admission to the Bar immediately effective. 466 U.S. at 561–62 n. 3, 104 S.Ct. at 1991–92 n. 3. As the United States Supreme Court stated, this statute, by its terms, does not limit the jurisdiction of the Arizona Supreme Court to establish the terms of admission to practice law; instead, "[this] section only applie[s] to Rules that regulate[ ] pleading, practice, and procedure in judicial proceedings in state courts." *Hoover*, 466 U.S. at 561–62 n. 3, 104 S.Ct. at 1991–93 n. 3.

We agree with the Court's interpretation of § 12–109 and find that it is as inapplicable to the rules we promulgated concerning attorney discipline as it was to the rules that we promulgated governing admission to the Bar. Rules regulating the practice of law, from admitting an attorney to disciplining an attorney, have nothing to do with regulating "pleading, practice and procedure in judicial proceedings." Accordingly we find that

§ 12–109 does not limit us in the exercise of our jurisdiction over disciplinary matters. Not only does this interpretation comport with the plain meaning of the statute's language, but it avoids the constitutional implications raised by the interpretation that Respondent urges on the court.

### 2. Legislative Limitations on Court's Power to Assess Costs and Expenses

■ A basic tenet of statutory construction is that statutes should be construed so as to be constitutional whenever possible. *Stillman v. Marston*, 107 Ariz. 208, 209, 484 P.2d 628, 629 (1971) (citations omitted). The interpretation of § 12–109 that Respondent urges us to adopt would allow the legislature to limit this court in determining the range of sanctions that we could impose in disciplining an attorney. Such an interpretation unnecessarily implicates constitutional concerns.

■ The Arizona Constitution grants this court the power to determine "who shall practice law in Arizona and under what condition." *Hunt*, 127 Ariz. at 261–62, 619 P.2d at 1038–39. Necessarily included within this power is the power to discipline those admitted to practice law. *E.g., In re Riley*, 142 Ariz. 604, 607, 691 P.2d 695, 698 (1984). As we have explained previously, one is admitted to the bar only after having met the requisite qualifications. *See, e.g., Bailey*, 30 Ariz. at 411, 248 P. at 30, discussing *Garland*, 71 U.S. (4 Wall.) at 378–79. Correspondingly, the court has the power to remove from the practice those no longer fit. *In re Greer*, 52 Ariz. 385, 390, 81 P.2d 96, 98 (1938). It necessarily follows, then, that the court has the power to impose sanctions that fall short of disbarment.

■ One of the sanctions that this court requires is the imposition of costs and expenses on disciplined attorneys.[14] *See* rule 52(a)(8), Arizona Rules of the Supreme Court. This court finds that imposing the

---

**14.** Other courts have adopted a similar position imposing costs and expenses as a part of the disciplinary process. *See, e.g., In re Lutz*, 100 Idaho 45, 592 P.2d 1362, 1366 (1979); *In re Dawson*, 131 So.2d 472, 474 (Fla.1961); *In re*

*Mississippi State Bar*, 361 So.2d 503, 506 (Miss. 1978); *In re Zinn*, 39 N.M. 161, 42 P.2d 776, 778 (1935); *In re Randall*, 72 Wash.2d 676, 435 P.2d 26, 29 (1967).

costs and expenses incurred by the State Bar in a disciplinary action on disciplined attorneys is necessary to effectively carry out our constitutional duties. Recovering costs and expenses from disciplined attorneys assists us in our duty to protect the public from those attorneys who are guilty of misconduct in a number of ways.

The discipline process is a costly endeavor. According to the State Bar's audited financial statements, the Bar's single largest category of expenditures was for attorney discipline. Disciplinary costs account for a large percentage of membership dues.[15] As one court noted when authorizing the State Bar to impose a special annual assessment on its members to finance disciplinary activities, the "[c]ourt's duty to protect itself, the judiciary, and the citizens of [the] State from persons unfit to practice law ... should not be hampered by the absence of adequate financing to do the job...." *Mississippi State Bar,* 361 So.2d at 506.

By shifting some of the financial burden of disciplinary procedures to those who are directly responsible for the costs, we insure the ability of the State Bar to continue its efforts in this area without having to ask the State Bar's members to further subsidize the Bar's disciplinary efforts.[16] Not only is the assessment of costs against an attorney who committed misconduct a more equitable means of financing the disciplinary process, but the imposition of costs and expenses serves the additional function of deterring other lawyers from engaging in unprofessional conduct. Moreover, as with restitution, we consider the imposition of costs and fees to be part of the rehabilitative process of our disciplinary

proceeding. *See Levine,* 174 Ariz. at 176 n. 21, 847 P.2d at 1123 n. 21.

Respondent argues that § 12–109 limits the court's ability to impose costs and fees on a sanctioned attorney. Although we have recognized the legislature's power to enact legislation in this area, we consistently have held that the legislature does not have the power "to enact laws that would make it impossible, or even unreasonably difficult" for the judicial department to perform its constitutional function. *E.g., In re Miller,* 29 Ariz. 582, 596, 244 P. 376, 380 (1926). Because we find that the imposition of costs and expenses plays an important and necessary function in our disciplinary process, we would be unnecessarily implicating constitutional questions if we were to interpret § 12–109 as applying to disciplinary actions. And this we will not do. We therefore find that § 12–109 does not apply to disciplinary actions.

### c. Imposition of Costs: the Purpose of Discipline

In the alternative, Respondent argues that assessment of expenses outside those recoverable in a civil action is a form of punishment, contrary to the stated purpose of lawyer discipline. We agree with Respondent that the purpose of lawyer discipline is not to punish the lawyer, but to protect the public and deter similar conduct by other lawyers. *E.g., Rivkind,* 164 Ariz. at 157, 791 P.2d at 1040. We disagree, however, with Respondent's characterization of the imposition of costs and fees as a form of punishment. As discussed above, we view this sanction as a means of protecting the public, deterring other lawyers from engaging in unprofessional conduct, and rehabilitating

---

**15.** Disciplinary costs accounted for approximately 35.8% of all membership dues collected in 1992; approximately 37.4% of the dues collected in 1991; approximately 42.12% of the dues collected in 1990; approximately 38.98% of the dues collected in 1989; and approximately 36.-65% of the dues collected in 1988.

**16.** We specifically note that our assessment of costs does not begin to cover the cost of the proceedings because, unlike some other states, we currently do not assess the State Bar's attorney's fees against disciplined attorneys.

In fact, the percentage of disciplinary costs that are recovered has been consistently low. In

1992, the State Bar recovered approximately 4.9% of the disciplinary costs that it incurred, *see* State Bar of Arizona, 1992 Financial Statement (1993); in 1991, it recovered approximately 3.4%, *see* State Bar of Arizona, 1991 Financial Statement (1992); in 1990, it recovered approximately 5.9%, *see* State Bar of Arizona, 1990 Financial Statement (1991); in 1989, it recovered approximately 5.6%, State Bar of Arizona, *see* State Bar of Arizona 1989 Financial Statement (1990); and in 1988, it recovered approximately 7.6%, *see* State Bar of Arizona, 1988 Financial Statement (1989).

the disciplined attorney. We recognize that the imposition of costs and expenses may *appear* punitive, but as the Washington Supreme Court noted when faced with a similar challenge, even though punishment is not the goal of attorney discipline, it is the "inevitable sequela of the sanction." *In re Vetter*, 104 Wash.2d 779, 711 P.2d 284, 292 (1985).

### 2. Objection To Amounts Requested for Specific Categories of Expenses

Respondent objects to the amount that the State Bar requested for hearing transcripts as unreasonable. Respondent also objects to the State Bar's request for reimbursement for State Bar counsel's routine in-state travel expenses, office supplies, and the staff investigator's time. He argues that these expenses are contemplated by the $450 charged for screening and administration costs.

#### a. Amount Requested for Hearing Transcripts

The State Bar requested $4–per–page, for a total of $3,680, for the costs associated with its preparation of the hearing transcripts. The State Bar arrived at this per-page rate by reviewing the per-page rates charged by independent court reporters in different disciplinary proceedings. Respondent argues that the $4–per–page charge requested is unreasonable, claiming that the State Bar is limited to recovering those costs *actually* incurred. Thus, Respondent argues, the correct method for determining the cost of the hearing transcript is for the State Bar to calculate the State Bar typist's hourly wage to include a percentage for overhead, and apply that figure to the amount of time that the typist actually spent on this project.

The costs and expenses of a disciplinary proceeding are assessed against a sanctioned attorney pursuant to Supreme Court rule 52(a)(8), which does not contain language that limits the recovery to actual costs or expenses incurred. Although we have defined the types of expenditures that may be recovered as either costs or expenses, these definitional terms are limiting only in the types of expenditures that are recoverable. *See* rule 46(g)(7), Arizona Rules of the Supreme Court.

No Arizona cases address how costs should be calculated in a disciplinary action. Cases discussing the calculation of attorney's fees awarded to public sector attorneys, however, are instructional. Arizona courts have had to decide the proper method for determining attorney's fees in cases in which the employers of public sector attorneys were entitled to recover their fees. Unless specifically limited by statute to "the amount paid," Arizona courts have concluded that a public sector attorney's fee should be measured by the reasonable hourly rate prevailing in the community for similar work. *See State v. Mecham*, 173 Ariz. 474, 485–86, 844 P.2d 641, 652–53 (App.1992) (awarding market rates and distinguishing *Lacer v. Navajo County*, 141 Ariz. 392, 687 P.2d 400 (App.1984), because fees awarded in *Lacer* were statutorily limited to "amount paid or agreed to be paid"); *see also Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 187, 673 P.2d 927, 931 (App.1983) (stating in dicta that fees awarded to public sector attorneys should be measured by reasonable hourly rate prevailing in community for similar work).

As with public sector attorneys, determining the costs incurred by public sector employees presents a special challenge. Public sector employees do not bill for their work in the same manner as private sector employees. Consequently, public sector employees do not compute the cost of their work by the hour or by the project, and determining the costs that these agencies actually incur is difficult at best. When a market for the services provided by public sector employees exists, we see no reason to treat public sector employees differently from the way we treat public sector attorneys.

█ Although we recognize that State Bar employees are not technically public sector employees, their status approximates that of public sector employees. Accordingly, we find that a per-page rate, prevailing in the community for similar work, is an appropriate measure of the cost for transcription services employees of the State Bar provided in connection with this hearing.

In this case, the $4–per–page charged by the State Bar for transcription services its

employees provided was based on an informal survey of the per-page charges that independent court reporters charged the State Bar in different disciplinary cases. The charges range from $3.91 per page to $5.47 per page. Court reporters charged less than $4.00 per page in only 2 of the 7 cases surveyed. The $4–per–page that the State Bar is requesting falls within the per-page rate prevailing in the community for similar work and thus is both reasonable and recoverable by the State Bar.

#### b. Duplicative Expenses

Respondent also claims that the charges for Bar counsel's routine in-state travel expenses, office supplies, and the staff investigator's time are duplicative of the $450 charged for screening and administration. Respondent's claim, however, is not supported by the evidence. According to the Statement of Costs and Expenses that the State Bar submitted and to Rosemary B. Martin's affidavit, the amount charged for screening and administration solely reflects costs associated with screening or investigating disciplinary claims and "general" administrative costs incurred by the State Bar from the assignment of a case to a hearing committee through the conclusion of the case. These "general" administrative costs include charges for such things as administrative time expended by staff bar counsel, legal assistants, secretaries, typists, file clerks and messengers, postage charges, telephone costs, normal office supplies, and other factors normally attributed to office overhead. Ms. Martin specifically averred that travel expenses and staff investigator's times were not included in the amount charged for screening and administration. The Statement of Costs and Expenses submitted reflects charges for supplies purchased specifically for this case. We therefore find that Respondent's claim that he is being charged twice for the same expenses is unfounded.

### CONCLUSION

We agree with the Commission that clear and convincing evidence supports the findings that as to Count One, Respondent violated ERs 1.4(a), 1.4(b), 1.7(b), 3.3, 8.4(c), and 8.4(d), and that as to Count Two, Respondent violated ERs 1.15 and 3.2. We further find clear and convincing evidence that, as to Count Two, Respondent violated ER 8.4(d). We also agree with the Commission's findings as to the aggravating and mitigating factors that were applicable in this case. Finally, although we approve of the one-year suspension recommended by the Commission, we find that Respondent's continued failure to understand the nature of his acts compels us to take further steps to protect the public. Accordingly, as a pre-condition of reinstatement, we require Respondent to successfully complete a course in ethics at an accredited college of law, to pass the Multistate Professional Responsibility Examination, and to complete the Professionalism Course offered by the Arizona State Bar.

### DISPOSITION

Respondent is suspended for a period of one year. Before applying for reinstatement, Respondent must successfully complete a course in ethics at an accredited college of law, pass the Multistate Professional Responsibility Examination, and complete the Professionalism Course offered by the Arizona State Bar. Respondent shall also pay $8,060.52 to the State Bar for the costs and expenses of these proceedings, and pay restitution to Client A in the amount of $2,258.60. Respondent's reinstatement after suspension is provided for in rule 71, Arizona Rules of the Supreme Court.

MOELLER, V.C.J., concurs.

ZLAKET, Justice, dissenting.

I am unable to concur in the majority's resolution of this matter. Moreover, because I am reluctant to extend the significant length of this opinion, my remarks will be brief.

Respondent's "failure to acknowledge" the wrongful nature of his conduct, a finding affirmed by the majority as an aggravating factor, appears to have originated in large part from the aggressive defense advanced by his attorneys. I fear that today's opinion sends an erroneous message to those facing

the disciplinary process—that if they dare to challenge the charges against them, the consequences may be more severe than if they simply confess wrongdoing and pray for mercy. There is something demoralizing and destructive in such a message, something that violates the very spirit upon which our legal system is premised. Here, although some of respondent's arguments are weak, I do not find them to be spurious or contemptuous. Neither do I believe he should be penalized for taking an aggressive stance before the committee, the commission, or this court.

Respondent's failure to return the executed satisfaction of judgment, while exceedingly poor practice, is hardly the heinous offense portrayed by the majority. The finding that this conduct was "prejudicial to the administration of justice" strikes me as a considerable overstatement. It is also significant that neither the hearing committee nor the disciplinary commission made such a finding.

I agree that the use of respondent's "substantial experience in the practice of law" as an aggravating factor was inappropriate here.[17] I respectfully disagree, however, with the majority's claim that it gives no weight to this factor, and submit instead that its analysis has quite the opposite effect. Respondent had no prior disciplinary record over many years of practice, which should weigh in his favor. *In re Mulhall,* 159 Ariz. 528, 768 P.2d 1173 (1989). But in using the mitigating effect of those discipline-free years to "offset" the "substantial practice" aggravating factor, the majority effectively accords equal weight to both. Such an approach makes little sense to me. The net effect is to cancel out whatever mitigation respondent's "unblemished" disciplinary record might otherwise have provided, leaving him with no credit for it at all. This is clearly not the same as eliminating the "substantial experience" factor from the equation altogether, which is what I believe should have been done.

The method here does not appear to be any different from that utilized by the commission and the committee, both of which found and presumably weighed these aggravating and mitigating factors against one another. Perhaps that explains why, despite its claim of having eliminated the weight given to this particular aggravating factor, the majority finds no cause to consider a modification of the recommended discipline.

Respondent had a conflict of interest that he either failed to recognize or chose to ignore. His conduct was improper, and I do not dispute that he should be disciplined. In my judgment, however, a suspension of six months and one day,[18] followed by a supervised probationary period and mandatory participation in the state bar's law office management assistance program (LOMAP), ought to be sufficient. I would also remand this matter to the State Bar for a determination as to whether respondent did, in fact, voluntarily remove himself from the practice of law as he claims. If so, I would be inclined to give him credit for that time against any sanction imposed. The purpose of discipline, or so we like to say, is to protect the public rather than to punish the lawyer.[19] Nothing in the record suggests that respondent presents a continuing threat to the welfare of his clients, the justice system, or the public in general. Thus, credit for voluntary removal would be appropriate here.

On a final note, I believe the majority misunderstands respondent's legal argument regarding this court's authority. As I read the briefs, he questions our right to assess costs and expenses in disciplinary proceedings. He does not challenge our general power to govern the practice of law or to regulate the legal profession in this state. Thus, while I agree with the majority's reso-

17. The application of this "aggravator" is always somewhat troublesome but, as the opinion suggests, any detailed discussion of its use must await another day. *See* fn. 4, *supra.*

18. Such a term would require respondent to reapply for admission to practice. See Rules 71, 72, Sup.Ct.R.

19. *In re Coffey,* 171 Ariz. 544, 832 P.2d 197 (1992); *In re Rivkind,* 164 Ariz. 154, 791 P.2d 1037 (1990); *In re Nulle,* 127 Ariz. 299, 620 P.2d 214 (1980).

lution of the issue, I find its expansive discussion of our "power" unwarranted.

For the foregoing reasons, I respectfully dissent.