936 P.2d 1269

In the MATTER OF a Member of the State Bar of Arizona, Michael L. MURPHY, Respondent.

No. SB–95–0055–D.
Disc. Comm. No. 91–1053.

Supreme Court of Arizona.

April 29, 1997.

State Bar of Arizona by E. Jeffrey Walsh, Snell & Wilmer, Phoenix, for State Bar of Arizona.

Jennings, Strouss & Salmon, P.L.C. by Gary L. Stuart, Robert E. Coltin, Phoenix, for Respondent.

## OPINION

ZLAKET, Chief Justice.

This disciplinary proceeding arises out of a commercial transaction in which respondent was both an investor and the attorney for other investors. Concluding that he breached ethical duties owed to the investment's promoters, who were also clients of his law firm, a hearing committee recommended that respondent be suspended for at least two years. One committee member urged disbarment. The disciplinary commission rejected many of the committee's factual findings, proposing instead a one-year suspension. Both the state bar and respondent appeal. We have jurisdiction pursuant to Rule 53(e), Ariz.R.Sup.Ct.

## FACTS AND PROCEDURAL HISTORY

Respondent was a partner in the firm of Murphy & Posner. Robert Almquist, a Canadian citizen and an Arizona lawyer, was employed by the firm under a work visa. He was a litigation associate who also dabbled in real estate syndication and investments. Around April 1986, Almquist and a commercial broker, James D. Tuton, formed a limited partnership to buy land in Tempe. Murphy & Posner did the legal work connected with the purchase, the partnership formation, the offering memorandum, and the subscription documents. Respondent was an investor, as were other members of the firm.

Early in 1987, Almquist and Tuton contracted to buy land in Glendale, with the latter depositing $25,000 of his own money as a non-refundable down payment on the $1.1 million purchase price. Facing a 2-month deadline and needing another $250,000 to close the deal, the promoters decided to syndicate the purchase, as they had successfully done before. They named this most recent partnership "Glendale Palms."

There was a dispute in the testimony regarding respondent's role in the transaction. Nevertheless, the hearing committee found that he had initially encouraged Almquist and Tuton to pursue the deal, suggesting early on that he would be an investor. It also concluded that he had helped formulate offers on the property, reviewed the purchase documents before they were signed, and persuaded the promoters to give all related legal work to his firm.

Gary Pederson, another associate at Murphy & Posner, actually prepared the acquisition papers, as well as an offering memorandum and investor subscription package for the limited partnership. He was supervised by John Murphy, Jr., respondent's brother and a partner in the firm. Almquist and Tuton wanted to promote the package as a Regulation D exempt offering, which required that investors meet certain standards of sophistication and financial worth. To insure compliance, they asked prospective investors to complete a questionnaire and promised that the disclosed information would be kept confidential.

Almquist and Tuton divided the limited partnership into 100 shares, priced at $15,000 each. Estimating that they would need $360,000 in cash to meet the down payment and other expenses, the two structured the deal so that an investor purchasing a share would pay $3,600 down and sign a promissory note to pay the balance over four years. The offering memorandum indicated that the real estate would not be acquired unless all 100 units were sold. Although respondent claimed otherwise, the committee found that he had reviewed incoming agreements and kept himself continuously informed about the promoters' success in enlisting subscribers. It also determined that he had accepted personal responsibility for disposing of 20 shares.

By April 17, 1987, Almquist and Tuton had not sold all of the units. Taking advantage of an option in the purchase contract, they put an additional $2,000 in escrow to extend the closing deadline another 30 days. By Friday, May 15, the promoters thought they had reached their goal. Tuton had commitments for 50 shares, and Almquist, relying on respondent's verbal assurances that he would purchase 20, had accounted for the remaining 30 units.

When the two men approached respondent that afternoon to collect the down payment, however, he refused to proceed unless they personally guaranteed a 10% annual return on the investment. Although the partnership was structured to avoid personal liability and no other investors were given such assurances, Almquist and Tuton instructed Gary Pederson to prepare the guarantees. Respondent then signed agreements obligating himself and his children's trust to five shares each. He also arranged for one of his clients, the trustee of the Nancy Hopkins Trust, to do the same. Finally, he favorably described the investment to his brother John without disclosing his own guaranteed returns. John subsequently bought five units, and the sale closed on May 18, 1987.

When the Phoenix real estate market declined precipitously, investors failed to make cash calls and the project became implausible. Upon advice from John Murphy, Almquist and Tuton decided to make no further payments. They returned the funds they were holding for investors and defaulted on the 1990 obligation. The property was subsequently lost to foreclosure.

A year earlier, respondent had resigned from Murphy & Posner and opened a new practice under the name Murphy & Associates. In 1991, that firm filed two lawsuits on behalf of the Nancy Hopkins Trust against Almquist and Tuton. One was in federal court alleging various securities violations, and the other was in state court based on the personal guarantees. Although respondent did not sign the two complaints, an associate testified that they were prepared and filed at respondent's direction. In defending against the lawsuits, Almquist and Tuton argued that respondent's unethical conduct precluded relief. The state bar was notified, and formal proceedings began.

Following numerous days of testimony, the hearing committee issued its report. It found that Almquist and Tuton were respondent's clients and that he had used private knowledge of their sales difficulties to extract the personal guarantees, in violation of ER 1.6(a) (duty of confidentiality) and ER 1.8(b) (use of confidential information to client's disadvantage). The committee also determined that he had failed to recognize or had ignored conflicts of interest between the trusts and the promoters, all of whom were his clients, in contravention of ER 1.7(a) (representation of clients whose interests are directly adverse), ER 1.7(b) (representation of one client materially limited by duties owed to another), and ER 1.9(a) (representation of client whose interests are adverse to former client in same or substantially related matter); and that he had violated ER 1.9(b) (use of information to former client's disadvantage) and ER 1.10 (imputed disqualification) by using confidential data regarding the financial worth of other investors in filing the federal securities complaint. Finally, it concluded that respondent had entered into a business arrangement with his clients without making full disclosure and allowing a reasonable opportunity to seek independent counsel, a violation of ER 1.8(a) (prohibited transactions). All three committee members believed that respondent's transgressions were serious. The chairman concluded that a two-year suspension was warranted, another urged five years, and the third recommended disbarment.

Respondent appealed to the disciplinary commission. Unconvinced that Almquist and Tuton were respondent's personal clients or that he had exploited any confidential information, the commission unanimously rejected the committee's findings and recommendations. It stressed that respondent was a litigator, not a transactional attorney, and that he had never billed the Glendale Palms partnership for any legal services. Based on its own interpretation of the evidence, the commission found only that he entered into a business transaction without obtaining a written waiver, ER 1.8(a), and obtained beneficial terms for himself and other clients while the firm represented those with whom he was negotiating, ER 1.7(a).

## DISCUSSION

■ It is apparent from the conflicting committee and commission reports that the facts are in dispute. Having heard sharply contradictory testimony, the committee specifically questioned respondent's credibility. Although this court is an independent trier of law and fact in disciplinary cases,[1] we ordinarily defer to the tribunal that heard the witnesses firsthand. *In re Varbel,* 182 Ariz. 451, 453, 897 P.2d 1337, 1339 (1995). Findings of unethical conduct must, however, be supported by clear and convincing evidence. *Id.*

### Use of Confidential Information

■ The bar's allegations of misuse involve two separate areas of confidential information: the promoters' selling difficulties and the financial qualifications of individual investors as reflected in their completed questionnaires. Respondent argues that neither category should be considered confidential because the requirements of a Regulation D offering place a broad duty of disclosure on the promoters. The commission agreed, finding "as a matter of law" that there was no confidential information capable of misuse and noting that Almquist's and Tuton's sales problems were "a common topic of luncheon conversation" at the firm—something that any investor, including respondent and his clients, had a right to know.

Regulation D is silent on the latter point. We observe, however, that Gary Pederson, one of the only witnesses with securities expertise, testified that information regarding the promoters' selling difficulties was confidential. We are also unaware of any rule by which law firm gossip transforms a client's private business into public knowledge. In our view, Almquist and Tuton were under no obligation to publicly disclose the progress of sales efforts, and such information should have been protected by their attorneys.

Regarding the questionnaires, Regulation D speaks of full public disclosure in terms of the issuer's financial background, not the investor's. *See* 17 C.F.R. § 230.502(b)(2). Nevertheless, because we believe the bar failed to prove by clear and convincing evi-

dence that respondent used knowledge of other investors' financial qualifications in drafting the federal securities complaint, we need not decide whether such information was also confidential.

Respondent points to Murphy & Posner's billing records to substantiate his claim that he never performed legal work for Almquist or Tuton relating to Glendale Palms. In his view, he was simply an investor and thus had no access to, or obligation regarding, confidential information. Although respondent's factual predicate may be true, it is not determinative. The duty plainly rested upon the entire law firm. American Bar Association Center for Professional Responsibility, *Annotated Model Rules of Professional Conduct* 165 (3d ed. 1996)("Lawyers in firms or other types of associations are assumed to have access to each other's confidential client information."). Moreover, we find clear and convincing evidence that respondent "looked over the shoulders" of Almquist and the other lawyers who performed the acquisition and partnership work. Thus, he had access to information regarding the promoters' difficulties in selling subscriptions.

Respondent also relies heavily on his continued personal and professional ties with Almquist after the guarantees were given in 1987. This apparently influenced the disciplinary commission, which believed that an ongoing relationship ran contrary to Almquist's claimed sense of betrayal. While the facts are uncontested, we do not draw the same inferences from them as have respondent and the commission. The record shows that Almquist was inextricably connected to respondent, both personally and professionally. His visa specifically required employment by Murphy & Posner, and he worked directly for respondent at the time. Almquist and Tuton testified to feelings of outrage and betrayal generated by the last-minute demand for guarantees. This was corroborated by Gary Pederson's observations of their demeanor and attitude on May 15. After the transaction closed, Almquist had ample reason to set aside his anger and continue his relationship with respondent. We see nothing inconsistent between his accusations and subsequent conduct.

---

1. The appeal of this matter was filed prior to the effective date of the 1996 amendments to the disciplinary rules. *See* Rule 53(e)(11), Ariz. R.Sup.Ct.

Our review of the record leads us to agree with the hearing committee that respondent made last-minute demands for personal guarantees knowing Almquist and Tuton had no other investors available, the escrow could not be extended beyond the following Monday, and the two men faced the loss of their down payment if they could not close. We thus conclude that he used confidential information to the detriment of his firm's clients. Disclosure of the information to the trusts breached ER 1.6; his personal use of it violated ER 1.8(b).

### Conflicts of Interest

With respect to the provisions of ERs 1.7 and 1.9, respondent makes several arguments. He again asserts that he was merely an investor and had no attorney-client relationship with Almquist and Tuton relating to Glendale Palms. Further, he claims that the dual representation was appropriate because the investors and promoters had a common goal—to make money. Likewise, respondent says he reasonably believed the interests of his trust clients would not become adverse to Almquist and Tuton. He explains: "At the inception of the transaction, the likelihood that the two Trusts would have to enforce Almquist's and Tuton's guarantees was no greater than the likelihood that Almquist and Tuton would have to enforce the two Trusts' promissory notes...." Finally, respondent argues that the promoters implicitly consented because they knew he represented the trusts when they sought his involvement in the investment plan.

As for ER 1.8(a), respondent contends that he satisfied its requirements because the terms of the transaction were fair, reasonable, and fully disclosed. According to him, Almquist and Tuton had offered personal guarantees as much as a month before closing. He thus reasons that they had sufficient time to seek outside counsel. Moreover, he says, the transaction documents show full consent to his investment in the partnership.

After careful review of the record, we believe that respondent's actions fell short of compliance with the ethical rules. As with the improper use of confidential information, whether he actually performed legal services regarding the Glendale Palms matter is of no consequence since he was a partner in the firm whose members did. *See* ER 1.10(a), Rules of Professional Conduct ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by ER 1.7, 1.8(c), 1.9 or 2.2."); ER 1.10 cmt., Rules of Professional Conduct ("[E]ach lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated.").

The interests of the trusts were clearly adverse to those of the promoters. Respondent's law firm had endeavored to insulate Almquist and Tuton from personal liability in connection with the limited partnership syndication. On behalf of his trust clients, respondent demanded personal guarantees that stripped away the very protection the firm had labored to produce. *See In re Pappas,* 159 Ariz. 516, 523, 768 P.2d 1161, 1168 (1988) ("[I]nterests need not be antagonistic, such as between buyer and seller.... [Those] of a general and limited partner always differ or diverge.").

We also cannot agree with the contention that Almquist and Tuton consented to the adverse representation. Their acceptance of the trusts' investments under the terms extracted by respondent do not constitute the informed and willing consent contemplated by the ethical rules. *See In re Shannon,* 179 Ariz. 52, 62, 876 P.2d 548, 558 (1994) (attorney must explain implications, advantages, and risks of common representation); *In re Neville,* 147 Ariz. 106, 113, 708 P.2d 1297, 1304 (1985) (full disclosure includes explanation of divergent interests and of need to seek independent legal advice). Furthermore, we have difficulty accepting the argument that dual representation here might not have adversely affected at least one of the firm's clients. *See* ER 1.7(a), Rules of Professional Conduct.

Regarding his own investment, respondent suggests that the imputed disqualification imposed by ER 1.10(a) applies to violations of ERs 1.7 and 1.9, but not to business transactions prohibited by ER 1.8(a). Under his reading of the rules, while he could not have represented persons or other entities in a business deal where their interests were adverse to those of other clients within his firm,

**380**

he was free to personally enter into the transaction on his own behalf. We fail to see the logic of such an interpretation and find that respondent's conduct violated ERs 1.7(a), 1.7(b), 1.8(a), and 1.9(a).

### DISPOSITION

Although divided over an appropriate sanction, the hearing committee agreed that respondent should be ordered to make restitution to Almquist and Tuton in the amount of $2,264.03 (fees and costs incurred in defending the lawsuits); to indemnify the promoters in writing against any and all judgments, losses, damages, and expenses arising from legal actions by the Nancy Hopkins Trust on the guarantees; to disassociate himself and his law firm from any direct or indirect involvement in the prosecution of those legal actions; and to reimburse the state bar for its costs. In light of its own factual findings, the disciplinary commission disagreed with the committee and instead proposed only that respondent be suspended for one year, pay the bar's costs, and pass the ethics section of the bar exam as a condition of reinstatement.

Both the committee and the commission found multiple aggravating factors. These included a selfish motive, a pattern of misconduct, the refusal to acknowledge wrongful actions, and substantial experience in the practice of law. That respondent had no prior disciplinary record was considered a mitigating factor.

 The lawyer-client relationship is seriously jeopardized when an attorney fails to preserve confidences or avoid conflicts of interest. If a lawyer abuses the trust and loyalty of his firm's client for the benefit of himself or others, disbarment is generally the appropriate sanction. *See* American Bar Association, *Standards for Imposing Lawyer Sanctions,* 4.21 and 4.31 (1991). In this case, however, we are greatly influenced by the fact that in 26 years of practice, respondent has never before received a disciplinary complaint. This very substantial mitigating evidence convinces us that a suspension will adequately serve "to protect the public from further acts by respondent, to deter others from similar conduct, and to provide the public with a basis for continued confidence in the Bar and the judicial system." *In re*

*Hoover,* 155 Ariz. 192, 197, 745 P.2d 939, 944 (1987). We thus suspend respondent from the practice of law for one year and order that he pay all costs and expenses incurred by the bar in this matter. Additional consequences such as monetary damages or restitution are best left to the civil courts in fact-intensive disputes like this one.

MOELLER and MARTONE, JJ., concur.