SUPREME COURT OF ARIZONA
En Banc

|  |  |  |
|---|---|---|
| In the Matter of | ) | Arizona Supreme Court |
|  | ) | No. SB-03-0007-D |
| WALTER E. MOAK, | ) |  |
| Attorney No. 004849 | ) | Disciplinary Commission |
|  | ) | Nos. 00-0258 |
| Respondent. | ) | 00-0698 |
|  | ) |  |
|  | ) | **O P I N I O N** |
| _____ | ) |  |

On *Sua Sponte* Review
From the Disciplinary Commission

**Respondent Suspended**

---

Jennings, Strouss & Salmon, PLC                                    Phoenix
     by J. Scott Rhodes
Attorney for Walter E. Moak

State Bar of Arizona                                               Phoenix
     by Karen Clark, Senior Bar Counsel
Attorney for State Bar of Arizona

---

M c G R E G O R, Vice Chief Justice

¶1        The State Bar of Arizona charged Respondent Walter E. Moak with three counts of attorney misconduct under the Arizona Rules of Professional Conduct.  After the parties stipulated to most of the relevant facts, a hearing officer considered the remaining factual issues, as well as aggravating and mitigating factors.  The hearing officer concluded that the State Bar had established all counts and recommended that Moak be suspended for six months and one day.  On review, the Disciplinary Commission of the Supreme Court (Commission) accepted the hearing officer's

findings of fact and agreed with his conclusions of law, but recommended a six-month suspension. Although neither party sought review of the Commission's decision, we exercised our right of *sua sponte* review to consider further the appropriate discipline to impose. Ariz. R. Sup. Ct. 53(e)7. We exercise jurisdiction under Article VI, Sections 1, 3, 5.4 and 5.5 of the Arizona Constitution and Rules 31 and 53 of the Arizona Rules of the Supreme Court.

## I.

¶2      The hearing officer's report thoroughly and clearly sets out the relevant facts, as stipulated and found after the hearing. The Commission and this court accept the hearing officer's factual findings unless they are clearly erroneous. *In re Alcorn and Feola*, 202 Ariz. 62, 64 n.4, 41 P.3d 600, 602 n.4 (2002). We find no clear error. Indeed, neither Moak nor the State Bar contests the findings. We therefore hold that the State Bar proved the charges of unethical conduct by clear and convincing evidence. Because our analysis of the appropriate sanction depends upon the facts underlying Moak's misconduct, we describe them in some detail below.

¶3      The hearing officer concluded that Moak violated multiple ethical rules (ERs). With respect to count one, the hearing officer found the following violations: 1.2 (scope of representation); 1.3 (diligence); 1.4 (communication); 1.9 (conflict of interest: former client); 3.3 (candor toward the

2

tribunal); 8.4(c) (misconduct: dishonesty, fraud, deceit or misrepresentation) and 8.4(d) (misconduct: prejudicial to the administration of justice). With respect to count two, the hearing officer concluded Moak violated ERs 3.3 (candor toward the tribunal); 4.1 (truthfulness in statements to others); 8.4(c) (misconduct: dishonesty, fraud, deceit or misrepresentation); 8.4(d) (misconduct: prejudicial to the administration of justice) and also Rule 51(e) of the Arizona Rules of the Supreme Court (willful disobedience or violation of a rule). Finally, with respect to count three, the hearing officer concluded Moak violated ERs 1.7(b) (conflict of interest); 1.8(a) (conflict of interest: prohibited transactions); 1.8(e) (conflict of interest: financial assistance) and 1.8(j) (acquiring a proprietary interest in the cause of action).

¶4      The hearing officer next determined that Moak committed "knowing" ethical violations, that is, he acted with a "conscious awareness of the nature or attendant circumstances of the conduct but [was] without the conscious objective or purpose to accomplish a particular result." *American Bar Association Standards for Imposing Lawyer Sanctions* (*ABA Standards*) at 7 (1991).[1] After considering proportionality principles and weighing aggravating and mitigating factors, the hearing officer issued his report.

---

[1]      In this opinion, we refer to each specific standard set forth in the *ABA Standards* compilation as "Standard *x*".

3

¶5 We review conclusions of law *de novo*, as does the Commission. Ariz. R. Sup. Ct. 53(d)2, (e)11. The Commission adopted the hearing officer's conclusions of law and agreed that Moak knowingly violated the Rules of Professional Conduct.[2] We also agree with those conclusions of law. In exercising its authority to review the hearing officer's disciplinary recommendation, the Commission reduced Moak's suspension period to six months. Suspensions of six months or less differ significantly from suspensions of more than six months. An attorney suspended

---

[2] The *ABA Standards* distinguish the seriousness of misconduct based on the attorney's mental state: intent, knowledge and negligence. *ABA Standards* at 7. An attorney acts with intent when it is her "conscious objective or purpose to accomplish a particular result." *Id.* An attorney acts with knowledge when he is "conscious[ly] aware[] of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* An attorney acts negligently when she fails "to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in that situation." *Id*.

The *ABA Standards* categorize discipline according to culpability. Consequently, determining that a violation was committed under a particular mental state is critical. Absent aggravating and mitigating factors, disbarment is the presumptive sanction only when an attorney intends to deceive the court by "improperly withhold[ing] material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." Standard 6.11.

Suspension, on the other hand, is generally the appropriate sanction when an attorney knowingly withholds information "and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding." Standard 6.12. In either case, the presence of aggravating and mitigating factors affects whether discipline should be more or less severe than the presumptive discipline.

4

for six months or less may resume his practice when the period of suspension ends by filing an affidavit in lieu of application for reinstatement. Ariz. R. Sup. Ct. 71(c). An attorney suspended from practice for more than six months, in contrast, must complete a formal reinstatement process before being readmitted to the State Bar. *Id.* 71(d).

## II.

¶6    We elected to exercise *sua sponte* review to consider further the appropriate period of suspension. Both parties urge us to adopt the Commission's recommended six-month suspension, although the State Bar concedes that a suspension of six months and one day falls within the appropriate range of sanctions.

¶7    As an attorney licensed to practice in Arizona, Moak is bound by the Rules of Professional Conduct, which exist to protect the public, deter similar misconduct and preserve the public's confidence in the State Bar and the attorneys licensed under its authority. *In re Walker*, 200 Ariz. 155, 161 ¶ 26, 24 P.3d 602, 608 (2001).

¶8    Once ethical violations are established, we must identify an appropriate sanction. Our decision to impose a particular disciplinary measure is guided by the framework of  Standard 3.0, as set forth in the *ABA Standards*. *Id.* at 161 ¶ 21, 24 P.3d at 608. Standard 3.0 outlines four determinative factors in selecting appropriate discipline: "(a) the duty violated; (b) the lawyer's

5

mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." Standard 3.0; *accord In re Horwitz*, 180 Ariz. 20, 25, 881 P.2d 352, 357 (1994).

### A.

¶9 When an attorney faces discipline for multiple charges of misconduct, the most serious charge serves as the baseline for the punishment. *In re Cassalia*, 173 Ariz. 372, 375, 843 P.2d 654, 657 (1992) (adopting Commission report); *ABA Standards* at 6. We assign the less serious charges aggravating weight. *Cassalia*, 173 Ariz. at 375, 843 P.2d at 657. The State Bar and Moak stipulated, and we agree, that count two is the most serious charge of misconduct. We turn, therefore, to the facts underlying that count.

¶10 Moak's misconduct detailed in count two arose out of his representation of Julian Reed. Moak represented Reed in two separate actions arising from two car accidents that occurred approximately three years apart. The gravamen of this count involves Moak's failure to disclose, in the action based upon the first accident, the injuries Reed received in the second accident, and his failure to distinguish appropriately the injuries Reed sustained in the first accident from those he sustained in the second. Those failures misled the defendants from the first accident and deprived them of an opportunity to prove that Reed's injuries resulted, at least in part, from the second accident.

6

Moak's failures also misled the judge and the jury in the trial involving the first accident.

¶11      On June 11, 1995, Reed sustained injuries when a commercial truck struck his vehicle in La Paz County, Arizona. Reed retained Moak to pursue a lawsuit against the trucking company and its employee (La Paz defendants) and filed a complaint in August 1996 in La Paz County.  In July 1998, Reed was involved in a second automobile accident in Gila County, Arizona.  Moak also represented Reed in a lawsuit related to the second accident, filed in November 1998 in Gila County.

¶12      Moak's November 1996 disclosure statement in the La Paz action indicated that Reed had suffered severe head trauma and resultant visual field defect, but it made no mention of a brain injury or claim that Reed sustained any impairment of his cognitive functioning.  In response to discovery questions from defendants' counsel, Scott Alles, Moak eventually stated that Reed would claim damages for a "cognitive injury" consisting of a visual field problem and difficulty adding numbers, but he produced no medical testimony except with reference to the visual field problem.

¶13      Moak failed to supplement his disclosure statement in the La Paz County case to reveal the Gila County accident, although it occurred long before the La Paz action went to trial.  In the Gila County accident, Reed sustained a closed head injury with, according to medical records, probable brain stem involvement.  By

7

November 1998, the physicians treating Reed for the Gila County injuries noted that he had started experiencing severe tremors and short-term memory loss, amnesia and severe headaches.

¶14     In January 1999, during the deposition of an ophthalmologist as part of the La Paz discovery, the witness testified that Reed suffered from a "brain injury." Despite his knowledge of the medical records related to the Gila County accident, Moak opposed the La Paz defendants' attempts to conduct additional discovery related to a "brain injury." In his opposition, Moak did not disclose the Gila County injury or the medical records that attributed Reed's brain injury to the second accident. In addition, Moak obtained an order precluding from the La Paz trial any evidence related to other injuries, lawsuits or claims for damages.

¶15     In March 1999, Reed's La Paz trial began, concluding with an $800,000 verdict for Reed. Reed exhibited tremors throughout his trial testimony, a physical manifestation of injuries that the trial judge later concluded would have affected the jury's damage award. Reed testified that all his health problems, including a head injury, headaches and memory problems, resulted from the La Paz accident.[3] In closing argument, Moak emphasized Reed's brain injury and its effects, so evident to the jury during Reed's

---

    [3]     After the trial, and in connection with the Gila County action, Reed acknowledged that some of his injuries resulted from the second accident.

8

testimony.

¶16      In June 1999, after the La Paz trial concluded, Moak submitted a disclosure statement in the Gila County case.  There he disclosed Reed's closed head injury with possible brain stem involvement, as well as tremors, headaches and confusion.[4]

¶17      One month after filing the Gila County disclosure statement, Moak responded to a motion for a new trial in the La Paz action by arguing that Reed's brain injury, attributed to the La Paz accident, caused the injuries about which he had testified and that the extent of those injuries justified the jury's award.  He still had not disclosed the second accident to the La Paz defendants.

¶18      Finally, during Reed's December 1999 deposition in the Gila County action, Moak took steps that resulted in disclosure of the 1998 accident to the La Paz defendants.  During the deposition, Moak corrected his client's testimony to assure full disclosure of the La Paz accident.  Inexplicably, Moak even then did not notify the La Paz defendants of the second accident, although he asserts that he knew defense counsel in the Gila County action would notify Alles.

¶19      By this time, the La Paz defendants had filed an appeal.

_____

[4]      The hearing officer found that the Gila County disclosures demonstrate that Moak was aware of the overlap between the 1995 and 1998 injuries and that he was aware of the overlap prior to the La Paz trial.

When Alles learned of Reed's deposition testimony, he successfully requested that the court of appeals revest jurisdiction in the trial court, where he moved for relief from the judgment. Moak responded to various motions filed on behalf of the La Paz defendants, generally arguing (1) that the record did not show that Reed displayed tremors during his trial and (2) that Alles, rather than Moak, was to blame for Moak's failure to disclose, because Alles failed to exercise "due diligence" in questioning about other potential causes of Reed's injuries.

¶20 On March 15, 2000, the La Paz trial court concluded that Moak's non-disclosure tainted the original verdict and ordered a new trial. The court also awarded the La Paz defendants attorneys' fees for trial preparation, trial and post-trial motions. Moak then advised Reed to retain new counsel and to consider filing a suit against him for malpractice.

¶21 On May 25, 2000, the La Paz trial court held a hearing on the attorneys' fee award, at which new counsel represented Reed. At the hearing, Moak apologized for his conduct and requested that the attorneys' fees be charged against him alone. The court ordered Moak to pay, and Moak has since paid, the defendants $31,493.82 in attorneys' fees.

**B.**

¶22 In conducting its proportionality review, the Commission compared Moak's conduct to that of the two attorneys disciplined in

10

*In re Alcorn and Feola*, 202 Ariz. 62, 41 P.3d 600 (2002). There, we suspended two civil defense attorneys for six months after they agreed to and participated in a sham trial concocted by a personal injury plaintiff. *Id.* at 76 ¶ 51, 41 P.2d at 614. The Commission concluded that because the misconduct charged against Moak in count two was similar in nature, his suspension also should be six months.

¶23 On balance, we agree that Moak's misconduct is sufficiently similar to that of Alcorn and Feola to justify the comparison drawn by the Commission. The deception in both cases resulted in defective trials, which needlessly wasted the time, energy and resources of witnesses, judges and juries. In both instances, clients suffered harm because a verdict in their favor was vacated.

¶24 We also note differences between Moak's misconduct and that of Alcorn and Feola. In some respects, Moak's conduct is less serious. Moak is less culpable than Alcorn and Feola because those attorneys intentionally violated ethical rules, although their legal research and opinions solicited from other attorneys suggested that their behavior was not inappropriate. *Id.* at 66 ¶ 13, 74 ¶ 42, 41 P.3d 604, 612. Moak, in contrast, acted knowingly. In addition, once Moak accepted responsibility for his misconduct, he took steps to rectify the effects of his conduct on his clients.

¶25 In other respects, however, Moak's conduct is more

11

serious. The defendant in the Gila County case offered Reed a settlement. Had Reed accepted, his head injury from the second accident might never have been discovered by the La Paz defendants, and Moak would have successfully deceived the La Paz court and defendants. Moreover, Moak's conduct injured both his own client and the La Paz defendants, who faced a substantial and invalid verdict, whereas Alcorn and Feola's sham trial benefitted the plaintiff although it eventually harmed their client. *Id.* at 65 ¶ 12, 41 P.3d at 603. Furthermore, Moak's conduct was largely driven by the chance for personal gain, whereas Alcorn and Feola did not act out of self-interest. *Id.* By deciding not to disclose the Gila County accident in the La Paz case, Moak acted in a manner that could have led to double recovery for Reed's head injury, which in turn would have increased Moak's fee under the contingency fee agreement.

¶26 The presumptive discipline for Moak's actions involving Reed's representation, like the presumptive discipline for Alcorn and Feola, is suspension. Under Standard 6.12, suspension is generally appropriate when an attorney knowingly makes a false statement of material fact to or knowingly withholds material information from the tribunal. Standard 6.12; *see In re Alcorn and Feola*, 202 Ariz. at 75 ¶ 47, 41 P.3d at 613. The presumptive suspension period established by the *ABA Standards* is six months. Standard 2.3; *see In re Alcorn and Feola*, 202 Ariz. at 75 ¶ 47, 41

12

P.3d at 613.  We then must determine whether the aggravating factors, offset by the mitigating factors, justify a suspension longer than six months.

¶27     The parties assert that the aggravating and mitigating factors present here also mirror those considered for Alcorn and Feola.  To some extent, we agree.  No one disputes that four aggravating factors apply to Moak: dishonest or selfish motive, Standard 9.22(b); pattern of misconduct, Standard 9.22(c); multiple offenses, Standard 9.22(d); and substantial experience in the practice of law, Standard 9.22(i).  The parties also stipulated to four mitigating circumstances: absence of a prior disciplinary record, Standard 9.32(a); full and free disclosure to the disciplinary board or cooperative attitude toward proceedings, Standard 9.32(e); imposition of other penalties or sanctions, Standard 9.32(k); and remorse, Standard 9.32(l).

¶28     Alcorn and Feola also established four mitigating factors: absence of dishonest or selfish motive, Standard 9.32(b); cooperative attitude toward proceedings, Standard 9.32(e); imposition of other penalties or sanctions, Standard 9.32(k); and minimal risk of reoccurrence.  *In re Alcorn and Feola*, 202 Ariz. at 75 ¶ 46, 41 P.3d at 613.

¶29     Only one aggravating factor influenced our determination of Alcorn and Feola's ultimate sanction.  Each had significant experience in the practice of law, Standard 9.22(i).  *Id.* at 74 ¶

13

44, 41 P.3d at 612.[5]  This aggravating factor is just one of four established against Moak. In weighing aggravating and mitigating factors, however, we do more than simply count the factors.

¶30     Our concern here rests with whether the Commission gave sufficient weight to the aggravating factors, particularly the pattern of misconduct and multiple offenses, in imposing discipline.  Over a one-year period, Moak violated fundamental duties owed to two clients, a former client, the court and opposing parties.  This court views a continuing pattern of misconduct as calling for a lengthy suspension.  *E.g.*, *In re Murphy*, 188 Ariz. 375, 380, 936 P.2d 1269, 1274 (1997) (suspending an attorney for one year after he committed numerous ethical violations during a real estate transaction); *In re Augenstein*, 178 Ariz. 133, 139, 871 P.2d 254, 260 (1994) (imposing a two-year suspension on an attorney charged with three counts of professional misconduct and found to violate several rules of professional responsibility).  To fully understand the gravity of Moak's pattern of misconduct, we examine the additional charges established by the State Bar.  The strength of those charges as aggravating factors depends, in large part, upon the seriousness of the charges.

---

[5]     Alcorn and Feola each had a prior disciplinary sanction that, under Standard 9.22(a), could have served as an aggravating circumstance.  *In re Alcorn and Feola*, 202 Ariz. at 74 ¶ 44, 41 P.3d at 612.  We chose not to consider this factor because the prior sanctions occurred several years beforehand and, thus, were too remote in time to serve as a reliable aggravator.  *Id.*

¶31     The first of the additional charges considered as an aggravating factor arose out of Moak's representation of a husband and wife, Jacob and Renee Luster.  The Lusters retained Moak to represent them in August 1997, following an automobile accident in which the couple sustained injury when the car driven by Jacob collided with another.  A potential conflict existed because, as one of the drivers involved in the accident, Jacob may have contributed to the accident.  If so, Renee could assert a claim against her husband.  Moak appropriately warned the Lusters that he could not continue to represent them both if Renee filed an action against Jacob.  *See generally* Ariz. R. Sup. Ct. 42, ER 1.7(a).[6] Renee told Moak that she did not feel her husband was at fault.

¶32     Several months later, the Lusters told Moak that although he should not continue representing them both, he should continue representing Renee.  In November 1997, Moak sent Jacob a letter

---

[6]     ER 1.7(a), which sets out the general rule governing conflicts of interest, provides:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1)     the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> (2) each client consents after consultation.

Ariz. R. Sup. Ct. 42, ER 1.7(a).

15

stating, "You and Renee informed me that you wanted me to continue to represent Renee and that [Jacob] would find another attorney."

¶33 On June 2, 1998, Moak filed a lawsuit on Renee's behalf against James Pender, the other driver involved in the accident. Pender's answer named Jacob as a non-party at fault. After taking Pender's deposition, Moak concluded that Renee's suit could not proceed without naming Jacob as a defendant. On October 27, 1998, Moak wrote Renee stating that, because of the conflict of interest created by the continuing duties he owed to his former client, Jacob, he was withdrawing as her counsel. Two days later, Renee called Moak to discuss the Pender lawsuit. Moak reminded Renee that he could not represent her. Because Renee did not want to change counsel, she told Moak that Jacob would consent to the continued representation.

¶34 On March 4, 1999, Moak sent Renee a letter in which he stated, "Jacob must discuss with his own attorney whether he will give me permission to continue to represent you even though a civil complaint is filed against him on your behalf." *See generally* Ariz. R. Sup. Ct. 42, ER 1.9.[7] Moak stressed that Jacob had not

_____

[7] ER 1.9, which sets out the general rule regarding conflicts of interest with former clients, provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after

16

yet discussed the situation with his attorney and gave Renee the following advice:

> [I]t is my recommendation that the present lawsuit be dismissed and a new lawsuit be filed by you without counsel naming both James Pender and Jacob Luster as defendants. After Luster is served with the suit papers, he will have to deliver them to his attorney and you can send Jacob non-uniform interrogatories asking him if he has any objection to Moak Law Office, P.C. representing you in the action against him and Pender. If he does object, you will have to get another attorney or prosecute the matter on your own.

¶35 Moak sent another letter to Renee on March 24, 1999, asking her to contact Jacob about re-filing the lawsuit. Moak, on his own initiative, then drafted a second complaint naming both Jacob and Pender as defendants and mailed it to Renee on April 28, 1999, for her signature and filing. Renee alleges that she did not receive the mailing. Meanwhile, on April 23, 1999, Moak and Pender's attorney filed a stipulation dismissing the original lawsuit without prejudice.

¶36 The statute of limitations ran on Renee's case on August 3, 1999. Near that date, Moak checked the court records and learned that Renee had not filed the complaint he drafted in April. Concerned about the statute of limitations, which in fact had

---

consultation; or
    (b) use information relating to the representation to the disadvantage of the former client except as ER 1.6 would permit with respect to a client or when the information has become generally known.

Ariz. R. Sup. Ct. 42, ER 1.9.

17

expired, Moak signed Renee's name to the second complaint naming Jacob and Pender as defendants and filed it on August 13, 1999. Renee was unaware of his action and had not given Moak permission to sign her name or to file the complaint. In addition, Moak had not received permission from Jacob to file a complaint against him. Moak later explained that he believed Renee would not object to his actions and that signing and filing the complaint on her behalf was in her best interests.

¶37 Pender filed a motion to dismiss the second complaint for failure to comply with the statute of limitations. After the trial court granted his motion, Pender obtained a judgment against Renee for $86.00 in costs.

¶38 Renee, through new counsel, filed a malpractice action against Moak on January 17, 2001. The parties settled the case, and Moak paid Renee $20,000 as a condition of settlement.

¶39 These facts reveal additional serious ethical misconduct. Moak disregarded his duty of loyalty owed to Jacob Luster, his former client, by initiating a cause of action against him in the same matter as the prior representation without consent. *See* Ariz. R. Sup. Ct. 42, ER 1.9; *Foulke v. Knuck*, 162 Ariz. 517, 522, 784 P.2d 723, 728 (App. 1989) (holding ER 1.9(a) "prohibits subsequent representation of an individual whose interests are substantially adverse to those of the former client"). Also, by filing the complaint without Renee's consent and forging her name to the

18

verification, Moak disregarded duties owed to his client and made false statements to the court. *See* Ariz. R. Sup. Ct. 42, ERs 3.3, 4.2, and 8.4(c), (d); *In re Shannon*, 179 Ariz. 52, 63, 876 P.2d 548, 559 (1994) (holding an attorney violated his duty of candor to the tribunal by changing his client's interrogatory answers without the client's knowledge); *In re Mahoney*, 367 P.2d 148, 148 (Wash. 1961) (disbarring an attorney who, without consent, signed his client's name to a complaint). Moak's actions further show that he failed to keep Renee reasonably informed about the status of the second complaint and failed to use reasonable promptness by not assuring that her complaint had been filed before the statute of limitations ran. *See* Ariz. R. Sup. Ct. 42, ERs 1.3, 1.4. These facts, standing alone, could justify a suspension. This count, therefore, substantially aggravates Moak's misconduct.

## B.

¶40 The second of the aggravating charges involved Mr. Reed, the victim of the La Paz and Gila County accidents. During the course of his attorney-client relationship with Moak, Reed informed Moak that he needed money and was considering taking out a loan at an interest rate of fifteen percent per month. Moak told Reed that he probably would not obtain a judgment in his two lawsuits anytime soon and that the high interest rate could offset any recovery.

¶41 Shortly thereafter, Moak's wife approached Reed and offered to loan him money. Reed agreed to a total of four loans

19

totaling $13,000, payable at a rate of twenty-five percent interest per year.[8] Moak drafted a separate promissory note for each of the four loans authorizing him to withhold any future settlement funds or awards received on Reed's behalf and to repay the loans to his wife with those funds. Moak did not advise Reed to seek independent counsel concerning the proposed loan agreements.

¶42 Reed did not make any payments on the loans. Instead, the loans were forgiven as part of Reed's settlement of his malpractice action against Moak.

¶43 The misconduct involved here is obvious. In *In re Stewart*, we censured an attorney for advancing money to his client. 121 Ariz. 243, 245, 589 P.2d 886, 888 (1979). We held that advances are dangerous because an attorney then "acquires an interest in the outcome of a suit in addition to his fees [and] can lead to the attorney placing his own recovery ahead of his client['s interests]." *Id.* Moak's misconduct extends beyond advancing funds to a client. Moak violated ER 1.7(b) by representing Reed when Moak's responsibilities to his wife could have affected his representation of Reed. He knowingly acquired a pecuniary interest adverse to that of Reed and provided financial assistance to Reed in connection with pending litigation. *See*

---

[8] The total consisted of the following four loans: A loan of $5,000 made on November 19, 1999; a loan of $3,500 on December 3, 1999; a loan of $2,000 on March 30, 2000; and a loan of $2,500 on May 6, 2000.

Ariz. R. Sup. Ct. 42, ER 1.8(a), (e). Perhaps most seriously, he acquired a proprietary interest in the litigation that he was conducting for Reed. *See* Ariz. R. Sup. Ct. 42, ER 1.8(j). The loan proceeds actually increased Moak's contingency fee arrangement with his client and gave him a direct stake in the outcome of the trials.[9] His actions placed him in a position in which his interests could conflict with those of his client. Although Moak does not regard this count as particularly serious, we do not countenance any actions that carry the potential of placing a lawyer's interests above those of his client. This count, too, reflects serious misconduct.

### c.

¶44 Moak's pattern of misconduct and the multiple serious offenses he committed serve as substantial aggravators, which significantly change the balance of mitigating and aggravating factors. Unlike the situation in *In re Alcorn and Feola,* which involved a single aggravating factor, Moak's actions demonstrate a pattern of serious ethical lapses.

¶45 Both parties tell us that Moak's remorse and repayment to the injured parties, found as a mitigating factor, sufficiently

---

[9] We presume the expected interest income would be community property. *See Carroll v. Lee*, 148 Ariz. 10, 16, 712 P.2d 923, 929 (1986) (holding that "[t]here is a strong legal presumption that all property acquired during marriage is community property"). The record does not include evidence indicating otherwise.

demonstrate rehabilitation, and suggest that any discipline requiring Moak to demonstrate rehabilitation is unnecessary. Moak's actions, however, do not show his commitment to remedying the serious ethical deficiencies demonstrated in this disciplinary proceeding. Even though Moak made restitution to his victims, he failed to take measures dedicated to improving his understanding of the ethical duties associated with being a member of the State Bar. During the years since Moak's misconduct, for example, he could have enlisted a practice monitor, taken ethics enhancement classes or attended more than the minimum required ethics continuing legal education programs. We are unsure whether Moak fully understands and appreciates the duties imposed by the Rules of Professional Conduct and the magnitude of his transgressions. As a result, we are unpersuaded by this record that similar violations will not occur in the future.

## IV.

¶46　　For the foregoing reasons, we order Moak suspended from the practice of law in Arizona for six months and one day, beginning thirty days from the date of this opinion. Probation or conditions of reinstatement may be appropriate upon reinstatement; we leave this matter for consideration when Moak applies for reinstatement.

_____
Ruth V. McGregor, Vice Chief Justice

22

CONCURRING:

_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice